478 A.2d 310

**MANAGEMENT PERSONNEL SERVICES, INC., a/k/a M.S. Personnel**

**v.**

**Jennifer D. SANDEFUR.**

**No. 137, Sept. Term, 1983.**

Court of Appeals of Maryland.

July 16, 1984.

**334**

Harry A. Suissa, Silver Spring (Albert D. Pailet, Bethesda, on brief), for appellant.

No brief or argument on behalf of appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

SMITH, Judge.

In this case we are presented with the question of whether a trial judge correctly determined that appellee Jennifer D. Sandefur had just cause within the meaning of Maryland Code (1957, 1979 Repl.Vol.) Art. 56, § 166(d) and (e) to terminate employment which she procured through a licensed employment agency. We shall hold that the judge erred. Hence, she is liable to appellant Management Per-

sonnel Services, Inc. (the employment agency or the agency) over and above the judgment entered.

The employment agency is a fee charging employment agency covered under Art. 56, §§ 161–170. In June 1982 Sandefur sought its assistance in procuring employment. She signed the agency's standard contract form by the terms of which she agreed to pay 15% of her first year's salary if this were $15,000.00 or less. The reverse side of the agreement under "marketing areas" specifies, "Retail." At another point "Wants to Mdse." is written. Section 7 of the contract agreement provided:

"Employment shall be considered to be temporary when within 90 days after employment commences the employment is terminated through 'no fault' of the applicant, or the employment is voluntarily terminated by the applicant with 'just cause'. A temporary placement fee may be charged to any such applicant for such temporary employment. Such fee not to exceed twenty (20) percent of the total compensation received or seventy-five (75) percent of the permanent placement fee for the same position, whichever is the lesser."

Section 7 of the contract is in accord with Art. 56, § 166(d) and (e). Those subsections state:

"(d) Employment shall be considered to be temporary when within 90 days after employment commences the employment is terminated through 'no fault' of the applicant, or the employment is voluntarily terminated by the applicant with 'just cause.' A temporary placement fee may be charged to any such applicant for such temporary employment, such fee not to exceed twenty (20) percent of the total compensation received or seventy-five (75) percent of the permanent placement fee for the same position, whichever is the lesser.

"(e) In the event the employee is discharged 'for cause' or voluntarily leaves employment without 'just cause' within 90 days after employment commences, a fee not to

exceed 75% of the permanent placement fee may be charged to any such applicant."

Sandefur was under no obligation under the contract to accept any employment to which she might be referred. She was referred to and accepted a position with The Gap Stores, Inc. According to the placement confirmation and the acceptance verification, both of which she signed, the position was "Mgt. Train." Each specified a salary of $11,000. The placement confirmation indicated that the service charge would be $1,650.00. On June 18 she executed a note to the agency in the amount of $1,650.00 to be paid "$50.00 18 June 1982 with four equal payments of $400.00 starting 1 July 1982 continuing monthly until paid in full." Sandefur quit this job after working for The Gap about two months. She paid the agency only $450.00 on the note.

On November 3, 1982, the employment agency sued Sandefur in the District Court in Prince George's County for the remaining $1,200.00 on the note plus interest and attorney's fees.

On direct examination at trial Sandefur indicated that she terminated her employment "based on just cause." She said:

"I was unhappy with my position there. I was ... being a college graduate, I just didn't want to be a glorified sales person. I was hoping to advance in the company and at management level."

The record on direct examination further reflects:

"Q. You were in training, correct, you did not get the job as assistant manager?

"A. I quit before then though. I was given the opportunity."

The record on cross-examination states in part:

"Q. Ms. Sandefut[1], you said you were almost—you quit before you became a full-fledged assistant manager, do you know how close you were to becoming an assistant manager?

"A. No, I wasn't. It was some months off though.

"Q. When ah—

"A. I think you had to be employed there six months before you moved in.

"Q. Did you interview with Mr.—Mr. Jack Ginner—before accepting this job at The Gap?

"A. Twice.

"Q. Okay. And during that time, did he explain to you what your duties and responsibilities would be?

"A. Yes, he did.

"Q. Did he explain to you that you were going to become a part of a program called the "Assistant Management Training Program"?

"A. Yes, he did.

"Q. Did you understand?

"A. Yes, I did. It was also my understanding that I would have the opportunity to advance, but ah—that I would have—yes, he did explain the program to me."

The trial judge found for the employment agency but only in the amount of $30.00. He said in pertinent part:

"Well, gentlemen, I think we're right down to the issue here of paragraph seven in the agreement which comes out of the statute. 'The (unclear)[2] shall be considered to be temporary when within 90 days after employment commences, the employment is terminated through no fault of the applicant, or the employment is voluntarily terminated by the applicant with just cause.'

---

1. The record and pleadings in the District Court use the name "Sandefut." It appears that correctly this should be "Sandefur."

2. Obviously, "employment" as set forth in paragraph 7 of the contract was intended.

"Now, I suspect in this case the Legislature definitely intended to leave that word ambiguous. That one has got to keep in mind that this legislation was remedial. Really, it was designed—employment agencies certainly have a place in our society where they provide a service—certainly on hard to get jobs or jobs that are sought after, that are good jobs for employees, and deal with permanent employment.

\* \* \* \* \* \*

"I think the Legislature fully intended that that just cause be almost any cause that had any rational suggestive meaning to the employee, and they also, well intentionally, provided that the employment agency would not work for nothing on that. They just said the person wasn't going to get (unclear) rate.

"Accordingly, I find that the Plaintiff paid $450.00. I determine that based on her [subjective] test she left with just cause voluntarily in accordance with the statute, and she therefore owes them $30.00.

"Judgment will be in the amount of $30.00 plus court costs of $10.00 in favor of the Plaintiff against the Defendant."

The employment agency appealed to the circuit court. The judge who considered the matter referred to our holding in *Ryan v. Thurston*, 276 Md. 390, 347 A.2d 834 (1975), pertaining to appeals from the District Court, and Maryland Rule 1386 to the effect that "the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses." In finding for Sandefur he said in pertinent part:

"Judge Fisher said enough in the record to indicate that he recognized the issue in this case, and that is Article 56, Section 166(d) and (e), and that the issue was whether or not she had just cause to leave her employment, and he used a liberal test, a subjective test, since he concluded the legislation was, in effect, remedial, and concluded that

there was just cause, because in his judgment the job wasn't what she thought it was or was represented to be. It didn't say anything about misrepresentation, but I think that after a couple of months an employee would be in a pretty good position to know whether or not she was going to be a sales girl from then on or have some other responsibilities, and he chose to accept that factually in her judgment, it represented a sales girl, period.

"So, I can't say he was clearly erroneous. He did allow the $30.00 placement fee that is permitted under the statute and gave judgment for that amount, as the record shows, and I believe, had I been sitting in his shoes, I would have done the same thing."

We granted the employment agency's petition for a writ of certiorari.

As is so often the case in Maryland, we have been unable to locate any legislative history which reflects upon the problem at hand.

At least twenty-eight other states appear to have enacted statutes dealing with what is commonly denominated as "refunds" by employment agencies.[3] Only in California and

---

**3.** See Ark.Stat.Ann. § 81–1024(b) (1976); Cal.Bus. & Prof.Code § 9974.3(a) and (b) (West 1975); Colo.Rev.Stat. § 18–5–307(4) (Supp. 1983); Conn.Gen.Stat. § 31–131(a) (1983); Fla.Stat.Ann. § 449.05(9) (West 1981); Ga.Code Ann. § 34–10–13(e) (1982); Ill.Ann.Stat. ch. 111, § 905 (Smith-Hurd 1978 & Supp.1983–1984); Ind.Code Ann. § 25–16–1–7 (Burns 1982); Ky.Rev.Stat. § 340.053(2) (1983); La.Rev. Stat.Ann. § 23:111 B(3)(c) (West Supp.1984); Mass.Annot.Laws ch. 140, § 46L(D) (Michie/Law. Co-op. 1981); Mich.Comp.Laws Ann. § 339.1019 (West Supp.1984–1985); Mont.Code Ann. § 39–5–311(2) (1983); Neb.Rev.Stat. § 48–523 (1978); Nev.Rev.Stat. § 611.250 (1979); N.J.Stat.Ann. § 34:8–32(5)–(7) (West 1965 & Supp.1983–1984); N.Y.Gen.Bus.Law § 186 (Consol.1980); N.D.Cent.Code § 34–13–13.1 (1980); Ohio Rev.Code Ann. § 4143.14(A)(3) (Page 1983); Okla.Stat. Ann. tit. 40, § 54(b) (West Supp.1983–1984); Or.Rev.Stat. § 658.-185(2)(b) (1983); Pa.Stat.Ann. tit. 43, § 574(m) (Purdon Supp.1984–1985); S.C.Code Ann. § 41–25–40(c) (Law.Co-op.1983); Tenn.Code Ann. § 50–8–112 (Supp.1984); Tex.Stat.Ann. art. 5221a–7, § 3(a)(12) (Vernon Supp.1971–1983); Utah Code Ann. § 34–29–10 (1974); Va. Code § 54–872.21G (1982 & Supp.1983); Wash.Rev.Code § 19.31.170 (1983).

in Texas is anything similar to our "just cause" found and we have located no cases from those states which shed such light on their statutes as to be of assistance here.

The term "just cause" is defined in *Black's Law Dictionary* 775 (5th ed. 1979) as:

"A cause outside legal cause, which must be based on reasonable grounds, and there must be a fair and honest cause or reason, regulated by good faith .... Fair, adequate, reasonable cause .... Legitimate cause; legal or lawful ground for action; such reasons as will suffice in law to justify the action taken."

In *G & M Employment Service, Inc. v. Commonwealth,* 358 Mass. 430, 265 N.E.2d 476 (1970), *appeal dismissed,* 402 U.S. 968, 91 S.Ct. 1662, 29 L.Ed.2d 133 (1971), the Supreme Judicial Court of Massachusetts had before it a statute which provided that if the discharge of an applicant, within one month of entering upon his employment, was "not for just cause" the agency upon demand was to refund that portion of the fee paid in excess of 10% of the gross wages paid to the applicant. It was claimed that the words "not for just cause" were too vague to be enforced. The court said:

"The standard of 'just cause,' however, in the context of a statute regulating employment agencies, would require a determination (among other matters) whether there existed (1) a reasonable basis for employer dissatisfaction with a new employee, entertained in good faith, for reasons such as lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior, or (2) grounds for discharge reasonably related, in the employer's honest judgment, to the needs of his business. Discharge for a 'just cause' is to be contrasted with discharge on unreasonable grounds or arbitrarily, capriciously, or in bad faith." 358 Mass. at 435, 265 N.E.2d at 480.

*See also Amoco Oil Co. v. Dickson,* 378 Mass. 44, 47–48, 389 N.E.2d 406, 408–09 (1979).

■■■ As we observed in *Police Comm'r v. Dowling,* 281 Md. 412, 418–19, 379 A.2d 1007, 1010–11 (1977), there is no shortage of holdings of this Court relative to statutory construction. In that case we set forth a number of the principles we have enunciated, citing a number of our prior cases. These principles include: the cardinal rule of statutory construction is to ascertain and carry out the real legislative intent. In determining that intent the Court considers the language of an enactment in its natural and ordinary signification. A corollary to this rule is that if there is no ambiguity or obscurity in the language of a statute, there is usually no need to look elsewhere to ascertain the intent of the General Assembly. In addition where two statutes deal with the same subject matter, as in this case, they must be construed together if they are not inconsistent with one another. Thus, to the extent possible, full effect should be given to each. This is true notwithstanding the fact that the statutes may have been enacted at different times with no reference to each other, because in that case the rule is that the statute must be harmonized to the extent possible. This principle of statutory construction operates because the law does not favor repeal by implication. Further, a court may not insert or omit words to make a statute express an intention not evidenced in its original form. Absent a clear indication to the contrary, a statute, if reasonably possible, is to be read so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless, or nugatory. *See also Cannon v. McKen,* 296 Md. 27, 32, 459 A.2d 196, 199 (1983); *Board of Educ., Garrett Co. v. Lendo,* 295 Md. 55, 62–63, 453 A.2d 1185, 1188–89 (1982); *Smelser v. Criterion Ins. Co.,* 293 Md. 384, 388–89, 444 A.2d 1024, 1027 (1982).

■■■ We think the trial judge was wrong here in applying a subjective test. It will be noted that under subsection (d) if the employee is "terminated through 'no fault' of the applicant" or if the employee voluntarily terminates the employment "with 'just cause' ", the temporary placement fee is "not to exceed twenty (20) percent of the total

compensation or seventy-five (75) percent of the permanent placement fee for the same position, whichever is the lesser." However, under subsection (e) a greater fee is due if "the employee is discharged 'for cause' or voluntarily leaves employment without 'just cause' within 90 days after employment commences" because in that situation the fee is "not to exceed 75% of the permanent placement fee," there being no reference to 20% of the total compensation received and whichever is the lesser. Using a subjective test an individual nearly always can find a reason why he should not do a given act, particularly where his act may subject him to financial liability.

■ In this instance Sandefur has admitted that there was no misrepresentation. She admitted that the job was clearly explained to her. On direct examination when reference was made to the fact that she "did not get the job as assistant manager" she replied, "I quit before then though. I was given the opportunity." She had no special or extenuating circumstance such as illness or some other pressing personal problem for leaving her employment. We agree with 14 C.J.S. *Cause* at 44 (1939), " 'just cause' implies the existence of facts justifying the action taken, something more than mere wish." What was exhibited here was nothing more than a mere wish. The trial judge applied the wrong standard. Hence, it follows that under § 166(e) the employment agency was entitled to "a fee not to exceed 75% of the permanent placement fee" rather than a small portion of it as allowed by the trial judge. Judgment should have been for this sum less the sum paid plus accrued interest. The note did specify an attorney's fee "[i]n the event suit is instituted."

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART AND CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER REMAND TO THE DISTRICT COURT FOR ENTRY OF A JUDGMENT CONSISTENT WITH THIS OPINION; APPELLEE TO PAY THE COSTS.