612 A.2d 1301

## LINCOLN NATIONAL LIFE INSURANCE COMPANY

v.

## INSURANCE COMMISSIONER OF THE STATE OF MARYLAND, et al.

No. 147, Sept. Term, 1991.

Court of Appeals of Maryland.

Oct. 6, 1992.

Bryan D. Bolton (Stewart P. Hoover, Shapiro and Olander, on brief), Baltimore, for petitioner.

Meg L. Rosthal, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for respondents.

Argued Before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

The question presented here involves the construction of Md.Code (1957, 1991 Repl.Vol.), Art. 48A, § 234B(b). It reads:

> "If an insurer intends to cancel a written agreement with an agent or broker, or intends to refuse any class of renewal business from the agent or broker, the insurer shall give the agent or broker not less than 90 days written notice. Notwithstanding any provision of the agreement to the contrary, the insurer shall continue for not less than one year after termination of the agency agreement to renew through the agent or broker any of the policies which have not been replaced with other insurers as expirations occur. This subsection shall not apply to: (1) agents or brokers or policies of a company or group of companies represented by agents or brokers who by contractual agreement represent only that company or group of companies if the business is owned by the company or group of companies and the cancellation of any contractual agreement does not result in the cancellation or refusal to renew any policies of insurance; or (2) life, health, surety, wet marine and title insurance policies."

██ This statute states two rules in absolute terms and then states two exceptions. We shall refer to the rule stated in the first sentence as the "notice rule." We shall refer to the rule stated in the second sentence as the "renewal rule." The third sentence of subsection (b) states two separately numbered exceptions. The exception numbered (1) we shall call the "captive agent exception"[1] and the exception numbered (2) we shall call the "lines of business exception." The question is whether the lines of business exception applies to both rules or only to the renewal rule.

The question presented arises out of the complaint made to one respondent, Insurance Commissioner of Maryland (the Commissioner), by the other respondent, Gerald R. Veydt (Veydt). Veydt, by contract effective January 1, 1985, was appointed as an agent to "solicit applications for Individual Life Insurance, Individual Disability Insurance, Group Insurance, Annuities and [to] solicit subscriptions for securities offered by or through" the petitioner, Lincoln National Life Insurance Company (Lincoln National), and certain related companies. An Insurance Code prerequisite to that appointment is that Veydt be an individual licensed to act as an agent for life and health insurance and annuities. Art. 48A, §§ 167, 176 and 178.[2]

---

**1.** When describing the operation of subsection (b) we shall use only the term "agent" for purposes of brevity, even though subsection (b) refers to agents or brokers.

**2.** Section 167(a) provides:
*"Certificate and appointment required.*—A person may not act as an insurance agent unless:
(1) That person has obtained a certificate of qualification from the State in the particular kind or kinds of insurance or subdivisions thereof for which that person intends to act as agent; and
(2) That person has obtained an appointment or appointments from an insurer or insurers."
Section 176(a) provides that "[b]efore any individual is eligible for a certificate to act as agent or broker, with regard to kinds of insurance other than life and health insurance, annuities, [and certain limited lines,]" the individual must meet the qualifications prescribed by § 177. Section 176(b) requires meeting the qualifications prescribed

The contract between Veydt and Lincoln National provided that either party could terminate the appointment, with or without cause. No minimum period for a notice of termination was provided in the contract. By letter dated March 28, 1988, Lincoln National terminated Veydt's agency appointment effective March 31, 1988. Veydt complained to the Commissioner, contending that § 234B(b) required that he be given at least ninety days notice of termination. Lincoln National contended that § 234B(b) did not apply to the termination of appointments to write the lines of business covered by Veydt's agency contract with Lincoln National.

At the hearing in the Insurance Division, Lincoln National presented evidence describing the differences in company-agent relationships between agents appointed to solicit life and health lines, on the one hand, and property and casualty lines, on the other hand, particularly as to renewals of policies and the earning of commissions. There is no material dispute of fact in the instant matter concerning the general contours of these differences. They are well summarized by the Court of Special Appeals in the subject case. "Unlike property and casualty insurance policies, which typically have to be renewed annually or semi-annually, life, health, surety, wet marine, and title policies remain in effect for a specified period of time, or for a particular occasion, or until a certain event or occurrence, and are not renewed periodically." *Insurance Comm'r v. Lincoln Nat'l Life Ins. Corp.*, 89 Md.App. 114, 123, 597 A.2d 992, 996 (1992) (footnote omitted).

With respect to commissions, the intermediate appellate court summarized the evidence in stating Lincoln National's position.

"[A]n agent who produces property and casualty insurance policies, which renew annually or semi-annually, must get the insured to renew in order to earn his or her

by § 178 before eligibility for a certificate to act as agent or broker as to life and health insurance or annuities.

commission. If the agency is terminated, the agent will not receive the renewal commission. The 90–day termination notice provision and one year policy renewal provision offer some protective cushion for the agent's nonvested commission income until the agent secures a contract with another company through which to place similar insurance. Conversely, life insurance and health insurance agents have a contractual right with the company to receive certain continuing commissions based on the policy holders maintaining their policies. These types of policies are ongoing; if the agent terminates with the company, the company is still responsible to pay commissions for a certain period of time, sometimes for as long as the policy is in force and maintained by the policy holder. These types of policies are also more stable; agents' commissions are *vested* and they do not need the protection of 90–days notice."

*Id.* at 124, 597 A.2d at 996–97.

Lincoln National also argued that the legislative history of § 234B(b), which we shall review below, demonstrated that the lines of business exception was intended to apply to the notice rule.

The Commissioner, through a designee, ruled that Lincoln National had violated § 234B(b) by failing to give Veydt the required notice. The administrative agency construed the statute by emphasizing that the lines of business exception referred only to "policies" whereas the captive agent exception referred to "agents or brokers or policies." The Commissioner explained the perceived significance as follows:

"When the Legislature chose to use the word 'policy' in [the lines of business exception], it meant precisely that and nothing more. Had the Legislature intended to exempt life and health agents and brokers as well, it would have used the same language as that found in [the captive agent exception], which is 'agents or brokers or policies of a company or companies....' When the Legislature uses certain words in one part of a statute and omits them from others, one must assume that the omis-

sion was intentional.... [The] statute is to be read 'so that no word, phrase, clause or sentence is rendered surplusage or meaningless.' *Holy Cross Hospital v. Health Services Cost Review Commission,* 283 Md. 677[, 684, 393 A.2d 181, 184–85] (1978). There is an obvious distinction between an 'agent or broker' and a 'policy', and one must assume that the Legislature used the word 'policy' intentionally. Therefore, I find that the 90 day termination provision applies inasmuch as the agents are not exempt."

(Citation omitted).

The Commissioner was "not persuaded by Lincoln National's arguments concerning legislative history and presumed legislative intent." Indeed, the administrative agency stated the Maryland rule of statutory construction to be that "[w]hen the language of a statute is clear and unambiguous one should not turn to extrinsic evidence as an aid to construction."

Lincoln National sought judicial review in the Circuit Court for Baltimore City. That court reversed. The circuit judge concluded that the statute clearly stated that both exceptions applied to both rules.

Veydt and the Commissioner appealed to the Court of Special Appeals which reversed the Circuit Court for Baltimore City. *Lincoln Nat'l,* 89 Md.App. 114, 597 A.2d 992. The intermediate appellate court, paraphrasing the Commissioner's approach, reasoned as follows:

"Where the legislature intended to except both agents and policies from the provisions of subparagraph (b), it did so explicitly and unequivocally. 'Captive' agents as well as policies written by the companies represented by 'captive' agents are expressly excepted. But with respect to life, health, wet marine, and title insurance, the legislature excepted only the policies, not the agents representing the companies that issue such policies. To interpret the statute as Lincoln would have us do, we would have

to add words to the third sentence of § 234B(b) to make the pertinent portion of it read, in substance, as follows:

> This subsection shall not apply to—(2) life, health, surety, wet marine and title insurance policies *and agents and brokers who represent companies that issue such policies.* (Added words emphasized.)"

*Id.* at 124–25, 597 A.2d at 997. The court answered Lincoln National's legislative history argument by stating that it saw "nothing in the statute, or its history, or its apparent purpose that persuades us that the General Assembly intended it to be read as if the additional language were inserted." *Id.* at 125, 597 A.2d at 997.

We granted Lincoln National's petition for certiorari. We shall end the volley with a reversal of the Court of Special Appeals and a rejection of the Commissioner's ruling on this question of law.

The two exceptions to § 234B(b) are introduced by the following legislative directive: "This subsection shall not apply to:" the captive agent exception "or" the lines of business exception. "This subsection" means subsection (b) of § 234B. Both exceptions apply to the entire subsection. That is what the language *says.* There is no ambiguity in "[t]his subsection shall not apply to." Both exceptions apply to each rule of the subsection. The Commissioner's construction ignores the plain language of the statute.

Certainly the General Assembly knows the difference between a subsection and a sentence which is part of a subsection. Nevertheless, the Commissioner's construction of § 234B(b) is that the Legislature really meant to say that only the captive agent exception applies to the notice rule, but that both the captive agent and the lines of business exceptions apply to the renewal rule. If the General Assembly mistakenly said that both exceptions apply to the entire subsection, then the mistake should manifest itself in an absurd or illogical result. In that event this Court is not so slavish to the literal text as to refuse to effect the true

legislative intent. *Kaczorowski v. Baltimore*, 309 Md. 505, 525 A.2d 628 (1987).

Applying what the Legislature actually said produces the result, in broad strokes, that property and casualty agents and brokers, who are not captives, get commissions on renewals on their expirations for one year after termination of their agency contracts, and they get the opportunity to continue to place new business with the insurer for ninety days before the termination becomes effective. Those who place the types of insurance specified in the lines of business exception, as well as property and casualty agents who are captives, are excluded from the operation of subsection (b). That is not an absurd or illogical result. Generally speaking, the excepted lines of business are not written for periods of time, as are the property and casualty lines, but, assuming that premiums are paid as required, policies of the excepted lines of insurance are in effect until the occurrence or non-occurrence of an event. Further, it is not disputed in the instant matter that the producer's commissions ordinarily are payable based upon the original placement of the coverage with respect to the excepted lines, whereas the commissions of producers placing property and casualty coverages continue to be earned as the policies might be renewed from policy period to policy period.

In the administrative agency's ruling the Commissioner said: "Nor am I persuaded that the public policy of this State would best be served by my holding that life and health insurance agents are not entitled to 90 days written notice that their agency contracts will be cancelled." That is not a conclusion that the plain meaning of subsection (b) is absurd or illogical when viewed with the agency's expertise in the field of insurance. Rather, it is a personal opinion of what is more desirable—an opinion which ignores where the General Assembly clearly drew the line.

That the Legislature drew the line in subsection (b) between the excepted lines of business on the one hand and property and casualty business written by non-captives on the other is supported by *Travelers Indem. Co. v. Merling,*

326 Md. 329, 605 A.2d 83 (1992).[3]  Merling was an independent agent whose agreements to write property and casualty coverages for Travelers Indemnity and two of its subsidiaries were cancelled.  Following the expiration of the one year, post termination period provided under the renewal rule of subsection (b), Travelers solicited Merling's "expirations," *i.e.*, his customers.  Merling sued, contending that the solicitation violated his property rights in the expirations, as recognized under the American Agency System.  Relying on subsections (b) and (c), we held that § 234B "has legislatively changed the common law American Agency System." *Id.* at 339, 605 A.2d at 88.  The purpose of the statute was to protect the insureds.  Under the common law rule the insurer "could not use the expirations to directly solicit the insureds or to refer them to other agents who represented the company." *Id.* at 338, 605 A.2d at 87.  "The result was that, upon termination of the agent, a majority of the policies which originated from that agent were not renewed." *Id.*

We then described, in *Merling*, § 234B as it stood following amendments by Chapter 73 of the Acts of 1972.  At that time subsection (b) consisted of the notice rule, the renewal rule, and the lines of business exception.[4]  We said that the 1972 legislation was "a compromise . . . reached between the agent's right to his expirations following termination and the State's interest in protecting the insureds from cancellations or nonrenewals." *Id.* at 340, 605 A.2d at 88.  We held that § 234B modified Merling's property rights in the expirations so that the direct solicitations by Travelers Indemnity more than one year after termination of the

---

**3.** Both the Court of Special Appeals and the Commissioner were without the benefit of *Merling* at the time of their decisions.

**4.** As amended by Chapter 73 of the Acts of 1972, § 234B also included present subsection (a), the introductory section, and present subsection (c).  The latter reads: "No insurer shall cancel or refuse to renew the policy of the insured because of the termination of the agent's or broker's contract."

agency relationship were not tortious. *Id.* at 342, 605 A.2d at 89.

In *Merling* we defined "expirations." The term is also used in the renewal rule of subsection (b). We said:

"The term 'expirations' has a definite meaning and, as stated in *V.L. Phillips & Co. v. Pennsylvania Thresher-men, Etc.*, 199 F.2d 244, 246 (4th Cir.1952), *cert. denied*, 345 U.S. 906, 73 S.Ct. 645, 97 L.Ed. 1342 (1953), includes

'the records of an insurance agency by which the agent has available a copy of the policy issued to the insured or records containing the date of the insurance policy, the name of the insured, the date of its expiration, the amount of insurance premiums, property covered and terms of insurance.' "

326 Md. at 337, 605 A.2d at 86–87. Reference in that definition to the date of a policy's expiration indicates that we were not concerned in *Merling* with the excepted lines. This is made even more plain by the reliance on the *Pennsylvania Threshermen* case. Before defining "expirations," the Fourth Circuit stated the contention of the terminated agent-plaintiff in that case to be "that the custom and usage in the insurance field recognizes the property right of the agent to expirations on fire and casualty policies written by him." 199 F.2d at 246.

*Merling* did not deal with the notice rule of subsection (b). It is not, however, illogical or absurd to follow the literal language of subsection (b) and conclude that the minimum ninety day notice provision was part of the same compromise. While limiting property and casualty agents' property rights in expirations, those same agents obtained a guaranteed lead time on termination.

It is also clear that the agency agreements referred to, both in the renewal rule and in the notice rule, are agreements of the same type, that is, agreements dealing with lines of business which renew and which have expirations. The notice rule is triggered "[i]f an insurer intends to cancel a written agreement with an agent or broker, or intends to

refuse any class of renewal business from the agent or broker." § 234B(b). The renewal rule operates "[n]otwithstanding any provision of the agreement to the contrary." *Id.* This refers to an agreement that is the subject of the notice rule. The one year period of the renewal rule is measured from "termination of the agency agreement," again referring to the agreement described in the introductory sentence of subsection (b), the notice rule.

Nevertheless, the Commissioner concluded that controlling significance must be given to the fact that the words "agents or brokers" are used in the captive agent exception, but they are not used in the lines of business exception. Critical to this construction is a negative implication drawn from comparing the omission of "agents or brokers" in the lines of business exception with the General Assembly's use of "agents or brokers or policies" in the captive agent exception.

The short and dispositive answer to this strained analysis is that subsection (b), as enacted by Chapter 73 of the Acts of 1972, did not contain the captive agent exception. The only exception to the subsection was the lines of business exception. As enacted, subsection (b) read:

"If an insurer intends to cancel a written agreement with an agent or broker, or intends to refuse any class of renewal business from the agent or broker, the insurer shall give the agent or broker not less than 90 days written notice. Notwithstanding any provision of the agreement to the contrary, the insurer shall continue for not less than one year after termination of the agency agreement to renew through such agent or broker any of the policies which have not been replaced with other insurers as expirations occur. This subsection shall not apply to life, health, surety, wet marine and title insurance policies."

When the General Assembly created the right to notice of a cancellation of "a written agreement" or of a refusal of "any class of renewal business," and created a requirement that expirations be renewed for not less than one year, the

General Assembly excepted terminations of agreements with agents and brokers placing life and the other specified lines. The exception applied both to the notice rule and to the renewal rule, because the General Assembly said that subsection (b) did not apply to the specified lines of business.

The captive agent exception, with its reference to "agents or brokers" as well as to "policies," did not come into subsection (b) until inserted by Chapter 229 of the Acts of 1975. Its insertion did not prevent the lines of business exception from continuing to apply both to the notice rule and to the renewal rule. The evident purpose of the 1975 amendment was to narrow the scope of the notice rule and of the renewal rule. Although the rules were intended to be limited to property and casualty agents and brokers who owned their expirations, the language employed was broader than the objective. By stating two absolute rules which were limited only by the lines of business exception, the two rules also applied to agents and brokers who were employees of property and casualty insurers, *e.g.*, the direct writers, but who did not own their expirations. Captive agents simply were not part of the problem that the General Assembly sought to address, and they were excepted as well.

This holding has considered and given appropriate weight to the administrative interpretation. The Commissioner has decided this very case as an initial proposition nearly twenty years after subsection (b) was first enacted with only the lines of business exception. The opinion of the Commissioner cites no prior ruling by that agency on subsection (b). This Court has said that "a construction placed on a statute by administrative officials soon after its enactment is strong, persuasive influence in determining the judicial construction." *Board of Educ. v. Lendo*, 295 Md. 55, 63, 453 A.2d 1185, 1189 (1982). There is no contemporaneous construction in the matter before us. We have said that a contemporaneous construction is entitled to great deference when "the interpretation has been applied consistently and

for a long period of time." *Baltimore Gas & Elec. Co. v. Public Serv. Comm'n*, 305 Md. 145, 161, 501 A.2d 1307, 1315 (1986). There is no history of a long and consistent interpretation in this case. We have also said that an "important consideration is the extent to which the agency engaged in a process of reasoned elaboration in formulating its interpretation of the statute." *Id.* Here, a process of reasoned elaboration would not have considered present § 234B(b) as if it had emerged from the General Assembly as Athena is said to have emerged from the head of Zeus. The process should have considered the two stages in the enactment of present subsection (b). That would have revealed that the words "agents or brokers" in the captive agent exception could not be the keystone of the interpretation arch.

■ The Commissioner's erroneous construction of the statute appears to have resulted from too rigid an application of one of the so-called rules of statutory construction. The Commissioner said that "[w]hen the language of a statute is clear and unambiguous one should not turn to extrinsic evidence as an aid to construction." In support, the Commissioner cited, *inter alia, Lendo*, 295 Md. 55, 453 A.2d 1185. There what we said was "that if there is no ambiguity or obscurity in the language of a statute, there is usually no need to look elsewhere to ascertain the intent of the General Assembly." *Id.* at 62, 453 A.2d at 1189. We also said that the statute in *Lendo* "speaks for itself." *Id.* at 65, 453 A.2d at 1190. Nevertheless, we reviewed the historical evolution of the statute and rejected the administrative agency's interpretation that was first enunciated some eight years before the controversy in *Lendo*, but more than fifty years after the statute was enacted.

The Commissioner's restatement of the rule of construction treats legislative history much like the use of parol evidence in the interpretation of a contract. That is not correct. In *Kaczorowski*, 309 Md. at 514, 525 A.2d at 632, we said:

" 'We agree ... that "[t]he starting point in every case involving construction of a statute is the language itself." But ascertainment of the meaning apparent on the face of a single statute need not end the inquiry. This is because the plain-meaning rule is "rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists." The circumstances of the enactment of particular legislation may persuade a court that Congress did not intend words of common meaning to have this literal effect.' "
(Quoting *Watt v. Alaska*, 451 U.S. 259, 265–66, 101 S.Ct. 1673, 1677–78, 68 L.Ed.2d 80, 88 (1981) (citations and footnote omitted)).

For these reasons we reverse the judgment of the Court of Special Appeals.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THE COURT OF SPECIAL APPEALS FOR THE ENTRY OF A JUDGMENT AFFIRMING THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE DIVIDED EQUALLY BETWEEN INSURANCE COMMISSIONER OF THE STATE OF MARYLAND AND GERALD R. VEYDT, RESPONDENTS.

ROBERT M. BELL, Judge, dissenting, in which CHASANOW, Judge, joins.

The issue in this case, one of statutory construction, is whether, pursuant to Maryland Code (1957, 1991 Repl. Vol.), Art. 48A, § 234B, an insurance company may terminate, without giving the agent ninety days prior written notice, an agent's [1] written agreement to write life and health insurance policies for that company. The majority holds that it may and, so, reverses the judgment of the Court of

---

1. "Agent," as used herein, means "agent or broker," as those terms are used interchangeably in Maryland Code (1957, 1991 Repl.Vol.), Art. 48A, § 234B(b).

Special Appeals, which had held that it may not. *See Ins. Comm. of the State of Maryland v. Lincoln Nat'l Life Ins. Corp.*, 89 Md.App. 114, 597 A.2d 992 (1991). I respectfully dissent.

## I.

As the majority sees it, § 234B has application only to written agreements between an insurance company and agents who write property and casualty insurance and, when the agreement is not cancelled, to renewal business, *i.e.*, property and casualty insurance policies, written by those agents. More particularly, it asserts that the Legislature intended

> that property and casualty agents and brokers, who are not captives, get commissions on renewals on their expirations for one year after termination of their agency contracts, and they get the opportunity to continue to place new business with the insurer for ninety days before the termination becomes effective. Those who place the types of insurance specified in the lines of business exception, as well as property and casualty agents who are captives, are excluded from the operation of subsection (b).

At 72. Thus, under the majority's interpretation, property and casualty agents and brokers are entitled to ninety days notice prior to termination of their written contracts or before the company can refuse to renew property and casualty insurance policies they write. Life and health insurance, the line of insurance written by the respondent, Gerald R. Veydt, is excepted, as are captive agents and policies.

This result is neither absurd nor illogical, the majority maintains, because, unlike property and casualty insurance policies, health and life insurance policies [2] are not renewa-

---

**2.** Although we are here concerned with only health and life insurance, it is conceded, as it must, that the other kinds of insurance enumerat-

ble at periodic intervals; rather, if the premiums are paid as scheduled, they continue in effect until the occurrence or non-occurrence of the specific event upon which they are predicated. Moreover, while an agent earns commissions on property and casualty policies as they are renewed from time to time, commissions on life and health insurance policies are based on the original placement of the coverage and continue to be paid during the life of the policy.

In support of its interpretation, the majority relies upon the legislative directive which introduces the exceptions to § 234B(b). It reasons:

"This subsection" means subsection (b) of § 234B. Both exceptions apply to the entire subsection. That is what the language says. There is no ambiguity in "[t]his subsection shall not apply to." Both exceptions apply to each rule of the subsection.

At 71. Additionally, noting that the General Assembly can distinguish between a subsection and a sentence in that subsection, the majority suggests that an illogical or absurd result necessarily would be produced had the Legislature mistakenly said "subsection" when it actually meant "sentence". Had that occurred, it assures us, such a result could be corrected because "this Court is not so slavish to the literal text as to refuse to effectuate the true legislative intent." [3] At 71–72 (citing *Kaczorowski v. Baltimore*, 309 Md. 505, 525 A.2d 628 (1987)).

---

ed in the second exception, *i.e.,* the line of business exception, share the same characteristics as life and health.

**3.** However well intentioned this comment may be, the thought that it conveys—that we may in the guise of correcting an illogical result, completely ignore the literal text of a statute—is extremely troublesome. Where the literal text of the statute is clear and unambiguous, whether, or not, its meaning is, to us, illogical or absurd, I doubt that we may, in the name of interpretation, change it to achieve a meaning which we consider "logical." *But see State v. Brown,* 327 Md. 81, 90, 607 A.2d 923 (1992); *Jennings v. State,* 303 Md. 72, 82, 492 A.2d 295, 299 (1985).

## II.

When the court is faced with a question of statutory construction, it must approach its task in light of well-recognized, and oft-repeated, canons of statutory interpretation. The goal of statutory interpretation is to determine the legislative intent, *i.e.,* "the ends to be accomplished ..." in enacting it. *Morris v. Prince George's County,* 319 Md. 597, 603–04, 573 A.2d 1346, 1349 (1990); *Dept. of Env't v. Showell,* 316 Md. 259, 270, 558 A.2d 391, 396 (1989); *ANA Towing, Inc. v. Prince George's County,* 314 Md. 711, 715, 552 A.2d 1295, 1297 (1989). Determining the legislative intent of a statute is the "cardinal rule of statutory construction." *Kaczorowski v. City of Baltimore,* 309 Md. 505, 511, 525 A.2d 628, 631 (1987). The language of the statute is the primary source for the ascertainment and effectuation of legislative intent, *Newman v. Subsequent Injury Fund,* 311 Md. 721, 723, 537 A.2d 274, 275 (1988), and, since "what the [L]egislature has written in an effort to achieve a goal is a natural ingredient of analysis to determine that goal," *Kaczorowski,* 309 Md. at 513, 525 A.2d at 632, it is also the logical place to start the analysis. *Brodsky v. Brodsky,* 319 Md. 92, 98, 570 A.2d 1235, 1237 (1990).

The words used in the statute are to be given their natural and usual meaning, *Harford County v. Univ.,* 318 Md. 525, 529, 569 A.2d 649, 651 (1990), without resorting to strained, subtle, or forced interpretations, for the purpose of extending or limiting the operation of the statute. *Dickerson v. State,* 324 Md. 163, 171, 596 A.2d 648, 652 (1991); *Mayor & City Council of Baltimore v. Hackley,* 300 Md. 277, 283, 477 A.2d 1174, 1177 (1984). Nor should the court add words or attribute a meaning to the words that is not other wise appropriate. *See Management Personnel Services, Inc. v. Sandefur,* 300 Md. 332, 341, 478 A.2d 310, 314–15 (1984). Moreover, the statute must be read so that "no word, phrase, clause or sentence is rendered surplusage or meaningless." *Newman,* 311 Md. at 723, 537 A.2d at 275. *See also Kaczorowski,* 309 Md. at 519, 525 A.2d at

635; *Sandefur,* 300 Md. at 341, 478 A.2d at 314–15. Furthermore, an interpretation outside the ambit of reasonableness, logic, and consistency " 'is reason for rejecting that interpretation in favor of another which would produce a reasonable result.' " *D & Y, Inc. v. Winston,* 320 Md. 534, 538, 578 A.2d 1177, 1179–80 (1990) (quoting 2A Sutherland, *Statutory Construction,* § 45.12 (4th ed. 1984)). Finally, "[w]hen the language is clearly consistent with the apparent purpose of the statute and the result is not absurd, no further research is required." *Dickerson,* 324 Md. at 171–72, 596 A.2d at 652.

### III.

Section 234B addresses the cancellation or amendment, by an insurance company, of written agreements with insurance agents or the refusal to accept business from them. It provides, in pertinent part:

(a) No insurer may cancel a written agreement with a broker or agent with respect to insurance or refuse to accept insurance business from such broker or agent unless it complies with the provisions of this section.

(b) If an insurer intends to cancel a written agreement with an agent or broker, or intends to refuse any class of renewal business from the agent or broker, the insurer shall give the agent or broker not less than 90 days written notice. Notwithstanding any provision of the agreement to the contrary, the insurer shall continue for not less than one year after termination of the agency agreement to renew through the agent or broker any of the policies which have not been replaced with other insurers as expirations occur. This subsection shall not apply to: (1) agents or brokers or policies of a company or group of companies represented by agents or brokers who by contractual agreement represent only that company or group of companies if the business is owned by the company or group of companies and the cancellation of any contractual agreement does not result in the cancellation or refusal to renew any policies of insurance; or, (2)

life, health, surety, wet marine and title insurance policies.

(c) No insurer shall cancel or refuse to renew the policy of the insured because of the termination of the agent's or broker's contract.

\* \* \* \* \* \*

(f) An insurer may not cancel or amend a written agreement with an agent or broker with respect to property or casualty insurance because of an adverse loss ratio experience on that agent's broker's book of business if:

(1) The insurer required the agent or broker to submit the application for underwriting approval, and all material information on the application was fully completed, and the agent or broker has not omitted or altered any information provided by the applicant; or

(2) The insurer accepted, without prior approval, policies issued by the agent or broker, if all material information on the application or on the insurer's copy of any policy issued by the agent or broker was fully completed and the agent or broker has not omitted or altered any information provided by the applicant.

Subsection (a) explicitly, clearly, and unambiguously prohibits an insurer from cancelling an agent's written agreement with respect to insurance or from refusing to accept insurance business from that agent except in compliance with the provisions of § 234B. That section contains six subsections, each for the most part, addressing a separate issue. Compliance requires following the directions of the applicable subsection or subsections.

Subsection (b) is one of the provisions of § 234B with which an insurance company must comply. Its first sentence is, like subsection (a), clear and unambiguous. It forbids an insurer from cancelling a written agreement with an agent or from refusing to accept a class of renewal business from him or her without first giving the agent not less than 90 days prior written notice. The 90 days written notice is triggered by two separate events: (1) cancellation

of the agent's written agreement *or* (2) refusal of a class of renewal business. Significantly, and clearly, there is nothing in that part of the sentence relating to written agreements that explicitly, or by implication for that matter, prescribes the subject matter of the written agreement, not to mention mandates that it must relate to property and casualty insurance. On the other hand, from the evidence adduced, it is quite clear that the latter portion of that sentence does; because it relates to renewal business, it implicates property and casualty insurance policies, which must renew periodically.

The second sentence of subsection (b) is an amplification of the first. In particular, it addresses and, indeed, explains how, and for what period, policies that expire after cancellation of the agent's written agreement are to be renewed. Thus, the insurer is obligated, for not less than one year from the termination of the agency agreement, to renew through the agent whose agreement has been terminated those policies that have not been replaced with another insurer, as they expire. While it is true that this sentence refers only to renewal business, *i.e.*, property and casualty insurance policies, and relates back to that part of the first sentence that addresses written agreements, it does not, in terms, or otherwise, restrict the subject matter of such agreements to those involving agents authorized to write property and casualty insurance policies. It logically may be read as providing for the treatment of property and casualty policies in the event that a written agreement may involve a property and casualty agent.

The third sentence of the subsection, which begins: "This subsection shall not apply to ..." enumerates two exceptions. The first pertains to agents *and* policies of companies represented by contractually exclusive, *i.e.*, captive, agents and, so, is inapplicable to the situation *sub judice.*. So long as the cancellation of an agreement with one of those agents does not result in cancellation or refusal to renew any policies of insurance, no notice is necessary as a prerequisite to termination. The second exempts "life,

health, surety, wet marine and title insurance *policies."* (emphasis added). The question is whether there is any part of the subsection to which the second exception does not apply?

The Court of Special Appeals observed:

The second exception to the applicability of subsection (b) relates solely to certain types of insurance policies. Companies, such as Lincoln, that issue life insurance policies, and companies that issue health, surety, wet marine, and title insurance are not required to continue to renew such policies through an agent whose written agency agreement has been terminated. The logic of excepting those types of policies from the *renewal requirement of subsection (b)* was made understandable by the testimony of an expert witness for Lincoln. Unlike property and casualty insurance policies, which typically have to be renewed annually or semi-annually, life, health, surety, wet marine, and title policies remain in effect for a specified period of time, or for a particular occasion, or until a certain event or occurrence, and are not renewed periodically.

89 Md.App. at 123, 597 A.2d at 996 (footnote omitted, emphasis added). That court, however, rejected the petitioner's argument that, because the reasons for excluding life and health insurance policies from the notice provisions apply equally to the agents who solicit them, the legislative intent must have been to exempt life and health insurance agents as well as life and health insurance policies.

The intermediate appellate court reasoned: when the Legislature intended to exempt agents who represent companies that issue certain insurance policies from the notice requirement, it did so explicitly. Thus, in formulating the captive agent exception, in addition to excepting "agents and brokers," the Legislature excepted the policies written by the companies represented by those agents and brokers. The omission of the words "agents or brokers" from the exception set out in subsection (b)(2), therefore, must have been intentional. *See Am. Sec. & Trust Co. v. New Am-*

*sterdam Casualty Co.,* 246 Md. 36, 41, 227 A.2d 214, 216–17 (1967). The court also observed that reading subsection (b)(2) as including the agents who write the policies would require words to be added to the statute; to interpret subsection (b)(2) as applicable equally to agents and policies, despite the statutory language, one has to insert the words, "including agents who write such insurance." That, in turn, would render the words, "agents or brokers" or the word, "policies," as used in the first exception, mere surplusage. I agree.

Moreover, as we have seen, there are two units of consideration addressed in the first sentence of subsection (b): an agent's written agreement and any class of renewal business. In the case of the former, an agent's eligibility for notice need not, and, I submit, therefore, does not, depend upon the kind of policies that agreement authorizes the agent to write. Consequently, an exception relating to kind of policy has no definitional value insofar as that aspect of the notice provision is concerned. On the other hand, "renewal business" necessarily contemplates insurance policies that renew; hence, an exception based on kind of policy logically must relate to it. Thus, an exception for life and health insurance policies makes explicit that such policies are not meant when the term "renewal business" is used.[4]

---

4. The petitioner argues that:
    > In light of the fact that the renewal protection in Article 48A, Section 234B(b) is, by its terms, inapplicable to life and health insurance policies, it makes no sense to hold that the General Assembly wrote yet another sentence to achieve this very same purpose and exclude that which was already excluded. The General Assembly could not have intended such an illogical interpretation of the exclusion contained in Article 48A, Section 234B(b).

    Because life, health, wet marine, surety, and title insurance policies do not constitute renewal business—they are not renewed through the agent on a periodic basis—it says, it would be ludicrous to attribute a meaning to the exception that would only make explicit what is already implicit.

    It is not only conceivable, but reasonable, for the Legislature to have sought to remove any possible confusion as to the scope of the subsection; it makes sense to make explicit that life and health insurance policies are excluded from the term "renewal business" and,

If it were otherwise intended, the Legislature could have achieved the meaning the majority says it intended simply by adding the phrase, "with respect to property or casualty insurance," immediately after "written agreement with an agent or broker." That is what it did in subsection (f) when it wanted to limit that subsection's scope to specific classes of insurance.

Limiting the exception for life and health insurance policies to policies only is both reasonable and logical, rather than strained or forced. Such interpretation neither adds, nor deletes, words to achieve a desired meaning. And it does not attribute any meaning to the words of the statute that is not otherwise appropriate. The opposite is true of the interpretation urged by the majority. In addition to needing to add words, either to the first sentence of the subsection or the last, to obtain the desired meaning, its interpretation ignores the word, "or" in the first sentence. And, although the second sentence, *i.e.*, the renewal rule, makes perfect sense in the context of an agreement authorizing an agent to write several lines of insurance, only one of which is property and casualty, the majority prefers to interpret it as if it determines the outer limits, of "written agreement," making it relate *only* to those involving property and casualty insurance with property and casualty agents. Such an interpretation is, to say the least, strained.[5]

---

therefore, excluded from those *policies* that mandatorily must be renewed. In any event, the Legislature quite clearly limited the second exception to "policies." There is nothing in the legislative history or purpose that suggests that it intended to do otherwise.

5. The Legislature used the term "subsection" when referring to the exceptions. The majority does not see this as an example of imprecise drafting; indeed, it is quite sure the Legislature knows the difference between a subsection and a sentence. It suggests, on the other hand, that those of us who do not agree with its interpretation, do not and, therefore, chides us for failing to apply the exception in (b)(2) to all of the "subsection". While I do not agree that I have failed to give due consideration to the term "subsection"—as I see it, the life and health insurance policies exception does relate back to the portion of the first sentence that refers to "renewal business"—assuming that the majority

At the heart of the majority's position, then, is the notion that the agency agreement referred to in the first and second sentences are agreements of the same type: "[i]t is ... clear that the agency agreements referred to, both in the renewal rule and in the notice rule, are agreements of the same type, that is, agreements dealing with lines of business which renew and which have expirations." At 74. It is not at all clear to me that that is so. The written agreement referred to in the first sentence need not be, and, as I have demonstrated, by its express terms, is not, limited to lines of business which renew and which have expirations; only its disjunctive partner, "renewal business," is. Indeed, an agent who has a written agreement with a company, whatever the lines of business it authorizes, is, by virtue of the plain language of the first part of the first sentence, entitled to 90 days notice before the company cancels it. Interpreting the second sentence as impacting upon the relationship that might exist between the insurer and the agent after the agreement has been cancelled only if the agent was authorized by the agreement also to write property and casualty insurance is not strained. To read it otherwise would be to read the disjunctive out of that sentence. Had the Legislature intended that, then surely, it would have said so explicitly.

---

is correct, *i.e.*, my interpretation does violate a canon of statutory interpretation, and, so, does not provide a clear result, I would reach the same result, but under a different analysis. Where, under either of two interpretations, both arguably reasonable, application of the canons of construction do not provide a clear answer, an interpretation given the statute by the agency charged with its enforcement, if based on sound public policy reasons, must be "accorded the persuasiveness due a well considered opinion of an expert body." *Balto. Gas & Elec. v. Pub. Serv. Comm'n*, 305 Md. 145, 161–62, 501 A.2d 1307, 1315 (1986). *See also State v. Burning Tree Club, Inc.*, 315 Md. 254, 267, 554 A.2d 366, 373 (1989). The Insurance Commissioner noted that, while property and casualty agents may have a more compelling need for 90 days notice, agents with written agreements to write life and health insurance will also benefit from such notice. As the Commissioner said, "The provision of 90 days' written notice to life and health agents, during which time these agents can establish new relationships with other insurers, furthers a public policy of this State."

The majority suggests that the legislative history of subsection (b) supports its position. Again, I do not agree. It is true, of course, that the captive agent exception was not a part of the statute when the notice provision and the life and health insurance policies exception were first enacted. *See* Ch. 417, Acts of 1972. At that time, sentence 3 consisted of only the life and health insurance policies exception, which was identical to the exception as it exists today. Moreover, and significantly, all of what is now subsection (b), but without the captive agent exception, was enacted at the same time. This makes it even clearer that then, as now, the life and health insurance policies exceptions related back to that portion of the first sentence concerning "renewal business," to which notice was applicable, and not to the subject matter of the "written agreement." If it were intended to relate to "written agreement," there would have been no need for the Legislature to use such a strained and tortuous way of saying so. As we have seen, it could easily have appended a phrase to the first sentence making clear that the written agreement must concern property and casualty insurance, or, at least, renewal business.

It is also significant that the Legislature in 1972 also added a new subsection (c) to § 234B. That subsection, which obviously related back to subsection (b), prohibits an insurer from cancelling *or* refusing to renew an insured's policy because it had terminated the insured's agent's contract. Had subsection (b) been intended, as the majority says, to address only renewal business, there would have been no need for subsection (c) to prohibit cancellation of an insured's policy, "refusing to renew" would have been sufficient.

When the captive agent exception was added to the statute, *see* Ch. 224, Acts of 1975, the Legislature included within it, both agents and policies. In my view, that made the life and health insurance policies exception even more significant. Had the Legislature intended the life and health insurance policies exception to apply also to agents,

it would have done precisely what it had done three years earlier, it would have written the exception to reference only "policies." Rather than detracting from its weight, therefore, the later inclusion of the captive agent exception actually supports and underscores the validity of the interpretation given subsection (b) by the Court of Special Appeals and the Insurance Commissioner.

I have no quarrel either with the holding or the reasoning of *Travelers Indem. Co. v. Merling*, 326 Md. 329, 605 A.2d 83 (1992). I also agree that it has relevance, limited though it may be, to this case. Subsection (b) does address property and casualty business written by non-captive agents and it does prescribe not only that notice is required prior to cancelling that business, but the method of handling renewals during a transition period. To the extent that it addresses that aspect of subsection (b), *Merling* is relevant. As I read *Merling*, however, it does not support the proposition that the Legislature intended, by enacting subsection (b), to draw a line between certain excepted lines of business, on the one hand, and property and casualty business written by non-captive agents on the other. And it does not even purport to do so. In *Merling*, we simply were not concerned with the life and health insurance policies exception. Indeed, *Merling* did not deal with the operation of the notice provision at all.

As I have already pointed out, the Legislature did not say in clear and unambiguous terms that subsection (b) related only to property and casualty business. The majority's interpretation depends upon inference and indirection. While I do not quarrel with the majority's reading of *Merling* insofar as the definition of "expirations" is concerned, I find its reading of the *Merling* comments concerning a compromise the Legislature reached "between the agent's right to his expirations following termination and the State's interest in protecting the insureds from cancellations or nonrenewals," *Merling*, 326 Md. at 340, 605 A.2d at 88, as indicating that the compromise may have included the minimum 90 day notice provision, to be pure speculation.

In my view, in short, *Merling* does little to advance the majority's argument. It certainly does not undermine mine.

Because I believe, for all of the foregoing reasons, that subsection (b) has a purpose and a reach broader than property and casualty insurance and, in fact, contemplates that 90 days notice is due any agent, (whether writing property and casualty insurance, life and health insurance, or some other line of business) whose written agreement with an insurer is cancelled, I would affirm the judgment of the Court of Special Appeals.

Judge CHASANOW shares in the views expressed herein.