613 A.2d 986

Charles T. BIGGUS

v.

FORD MOTOR CREDIT COMPANY.

Joan C. JACKSON et al.

v.

FORD MOTOR CREDIT COMPANY.

No. 123, September Term, 1991, No. 4, September Term, 1992.

Court of Appeals of Maryland.

Oct. 16, 1992.

Anne K. Pecora (Civil Litigation Clinic, Richard F. Pecora, Baltimore), on brief, for petitioner Charles T. Biggus.

Robert J. Thieblot (Anthony W. Ryan, Bruce R. Miller, Thieblot, Ryan, Martin & Ferguson, Baltimore), on brief, for respondent Ford Motor Credit Co.

John A. Buchanan (Eugene E. Pitrof, Pitrof and Starkey, on brief), Upper Marlboro, for petitioner Joan C. Jackson.

Cheryl L. Hystad, Jerome J. Blake, Legal Aid Bureau, Inc., amicus curiae for Steven Williams, Barbara Ingram, Tonya Ingram, Sadie Cosby and Marietta Lewis.

Robert J. Thieblot (J. Edward Martin, Donna M. Raffaele, Thieblot, Ryan, Martin & Ferguson, on brief), Baltimore, for respondent Ford Motor Credit Co.

Argued Before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

Since 1941 Maryland law has included the Retail Installment Sales Act (RISA), currently Md.Code (1975, 1990 Repl. Vol.), §§ 12–601 through 12–636 of the Commercial Law Article (CL).[1] RISA regulates, from contract formation to deficiency judgment, secured installment sales of certain consumer goods and of motor vehicles. By the Acts of

---

1. Unless otherwise noted all statutory references are to the Commercial Law Article.

1983, ch. 143, the General Assembly enacted CL Title 12, Subtitle 10, "Credit Grantor Closed End Credit Provisions" (CLEC). CLEC addresses many aspects of closed end credit extensions, including interest rates, other charges, insurance, prepayment, refinancing, default, collection, and repossession. The statute includes commercial and consumer transactions, whether secured or unsecured, and, if secured, whether by realty or personalty. The transactions in the cases before us are secured installment sales of motor vehicles to consumers. Our task is to determine whether RISA or CLEC governs these transactions.

## I

### *Biggus*

Appellant, Charles T. Biggus (Biggus), bought a used Ford van from Sherwood Ford (Sherwood) in Baltimore City. Biggus signed a contract titled, "Maryland Vehicle Retail Instalment Contract." The contract was printed on a single sheet of paper approximately twenty inches long by eight and one-half inches wide. The front side contained the material terms. The cash price was $5,050.47, Biggus was given credit for a $350 down payment and a trade-in allowance of $1,500. Added to the unpaid balance of the cash price were itemized charges for taxes, tags, filing fees, credit life insurance, credit disability insurance, and an extended service warranty. The amount financed was payable in twenty-four monthly installments at an annual percentage rate of twenty-four percent.

The reverse side of the contract was covered in smaller print. The bottom half of that side contained the terms of an assignment of the contract by Sherwood to the appellee, Ford Motor Credit Company (Ford Credit). The top portion, headed "Additional Agreements," contained seven subsections. They included the grant of a security interest in the vehicle to Sherwood, and the following:

"G. **General:** Any change in this contract must be in writing and signed by you and the Creditor. The law of

Maryland applies to this contract including Subtitle 10 of the Maryland Commercial Law Article. If the applicable law does not allow all of the agreements in this contract, the ones that are not allowed will be void. The rest of this contract will still be good."

Biggus failed to make scheduled payments due on July 21 and August 21, 1989. In September 1989, Ford Credit sent Biggus a "Notice of Default and Intent to Repossess." The van was repossessed in Baltimore City. In November Ford Credit sent Biggus a "Notice of Repossession and Right to Redeem or Reinstate." That notice informed Biggus that the van was being stored at 7151 Brookdale Drive, which is the location of the Baltimore–Washington Auto Exchange in Howard County. The van was sold at a public auction for $700 in December. In February 1990, Ford Credit sent Biggus a "Statement of Sale," which itemized a deficiency of $2,248.92.

Ford Credit sued to collect the deficiency in the District Court of Maryland, sitting in Baltimore City. Biggus argued that RISA, with which Ford Credit had not complied, governed. The District Court agreed with Biggus. Ford Credit appealed *de novo* to the Circuit Court for Baltimore City, which held that CLEC applied. Judgment was entered for Ford Credit for $1,948,[2] plus interest from December 12, 1989. We granted Biggus's petition for a writ of certiorari.

### The Jacksons

Appellants, Joan C. Jackson and John W. Jackson, Jr. (the Jacksons), purchased a new 1989 Chevrolet from Ourisman Chevrolet Company (Ourisman) in Prince George's County. The Jacksons signed the same form contract as Biggus had signed. Ourisman likewise assigned the Jacksons' contract to Ford Credit. In August 1990, Ford Credit sent the

---

**2.** The court subtracted $301 for out-of-pocket repair expenses claimed by Ford Credit, finding that they were not allowed under CLEC § 12–1021(k). Ford Credit did not file a cross petition for certiorari on that issue.

Jacksons a "Notice of Default and Intent to Repossess" after the Jacksons missed their scheduled payments in June, July, and August. The car was repossessed in Prince George's County. Ford Credit sent the Jacksons a notice of their right to redeem, which stated that the car was being stored at the Baltimore–Washington Auto Exchange in Howard County. The car was sold at public auction in October for $2,800. In November 1990, Ford Credit sent the Jacksons a notice of a deficiency in the amount of $10,292.73.

Ford Credit sued to collect the deficiency in the Circuit Court for Prince George's County. The parties filed cross-motions for summary judgment. The Jacksons' motion contended that the contract was governed by RISA which Ford Credit had violated. The circuit court held that CLEC applied to the transaction and granted Ford Credit's motion for summary judgment. The Jacksons appealed to the Court of Special Appeals. We granted the Jacksons' petition for a writ of certiorari before hearing in that court.

## II

In this Court the position of the petitioners is supported by an amicus brief on behalf of certain of its clients by the Legal Aid Bureau, Inc. (Legal Aid), a brief which the Court has found to be most helpful in refining the issues. We shall refer to the petitioners and to Legal Aid collectively as the "consumers."

The position advocated by the consumers has three steps:

1. RISA governs the subject transactions;

2. Ford Credit violated RISA

(a) by failing to include the notice to buyer required by § 12–606(c); and

(b) by failing to retain the repossessed vehicles in the respective counties where they were sold or repossessed, in violation of § 12–625(a); and

3. The consequence of the violations is debtor absolution from deficiency liability.

Under RISA § 12–606(c)(2)

"the installment sale agreement shall:

. . . .

(2) Contain the following notice in 12–point bold type or larger, directly above the space reserved in the agreement for the signature of the buyer:

## Notice to Buyer

1. You are entitled to a copy of this agreement at the time you sign it.

2. Under the State law regulating installment sales, you have certain rights, among others:

(1) To pay off the full amount due in advance and obtain a partial rebate of the financing charge;

(2) To redeem the property if repossessed for a default;

(3) To require, under certain conditions, a resale of the property, if repossessed."

The Ford Credit contract does not contain that notice.

RISA § 12–625(a) requires the holder of a retail installment contract who has repossessed the security to "retain any repossessed goods in the county where the goods were sold to the buyer or were repossessed" for fifteen days after giving a written notice, required by § 12–624(d), concerning the rights of the buyer to redeem or require a resale and advising of the location of the repossessed goods. When Ford Credit repossessed it did not retain for that fifteen day period Biggus's vehicle in Baltimore City nor the Jacksons' vehicle in Prince George's County.

Ford Credit's position challenges the first step in the consumers' argument. Ford Credit denies that RISA applies. It points to CLEC § 12–1001(b)(1) which, at the time of the contracts involved here, defined "credit grantor" to mean any "corporation . . . making a loan or other extension

of credit under this subtitle which is ... a retailer." [3]   In their respective transactions with the Jacksons and with Biggus, Ourisman and Sherwood acted as credit grantors, submits Ford Credit, which, as their assignee, assumes the legal position occupied by the retailers.   Inasmuch as CLEC does not require that the contract contain a § 12–606(c)(2) type of notice to buyer, and inasmuch as CLEC does not require that repossessed goods be held for a specified period by the credit grantor in the county where the goods were sold or repossessed, there has been no violation of the applicable law, namely, CLEC.

Both the consumers and Ford Credit rely on CLEC § 12–1014(a).   It provides:

"Notwithstanding any other provisions of this title [CL, Title 12, "Credit Regulations"], a credit grantor may at its option elect to make a loan to any borrower either pursuant to this subtitle or as otherwise permitted by applicable law."

Ford Credit says that the election to extend credit pursuant to CLEC was made when the installment contract was entered into, utilizing a form that was drafted in compliance

---

3.  Section 12–1001(b), prior to amendments in 1990, read in its entirety as follows:

"(b) *Credit grantor.*—(1) 'Credit grantor' means any individual, corporation, business trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity making a loan or other extension of credit under this subtitle which is incorporated, chartered, or licensed pursuant to State or federal law, the lending operations of which are subject to supervision, examination, and regulation by a State or federal agency or which is licensed under Title 12, Subtitle 4 of the Financial Institutions Article or is a retailer.

(2) 'Credit grantor' includes any bank, trust company, or savings bank having its principal place of business in this State and incorporated under the laws of this State or any depository institution having its principal place of business in this State and organized under the authority of the United States.

(3) 'Credit grantor' includes a person not required to be licensed under this subtitle, who is exempt from the licensing provisions of Title 12, Subtitle 3 of the Financial Institutions Article, who makes a loan or extension of credit under this subtitle secured by a secondary mortgage on residential real property."

with CLEC and not in compliance with RISA. Ford Credit further submits that, if some kind of specific language is required in the contract, the requirement is satisfied by ¶ G of the form contract that specifically refers to CL "Subtitle 10" as included in the applicable law.

The consumers deny that the reference to CL subtitle 10, absent inclusion of the applicable *title* of the Commercial Law Article of the Code, can be an effective election. Further, Legal Aid submits that the election of CLEC or RISA must be express and mutually exclusive. By this Legal Aid means that the election must commit the credit grantor, at the inception of the transaction, down one path or the other, without any possibility that the credit grantor can switch legal theories during the course of the debtor-creditor relationship.

### III

Resolution of the issues here is better understood against the background of the local and legislative history that produced CLEC, as reflected in the bill files of the Department of Legislative Reference.

In response to the exceptionally high rise in interest rates at the beginning of the 1980s, the General Assembly increased to a twenty-four percent, simple annual rate the maximum rate of interest or finance charge for transactions entered into between July 1, 1982, and before July 1, 1985. Acts of 1982, ch. 753. The increased rate applied to certain collateralized or unsecured, non-commercial loans, to loans of more than $2,000 under the Consumer Loan Law, to loans under the Secondary Mortgage Loan Law, to closed end and open end retail credit accounts, to RISA contracts, and to loans by credit unions. *Id.*

By adding new § 12–115, Chapter 753 regulated repossession of goods securing certain loans that enjoyed the new maximum rate. The provisions of § 12–115 dealing with the aspects of repossession up to sale tracked, using loan nomenclature, the substantive and procedural repossession

provisions of RISA, with one exception. *Compare* Md.Code (1983 Repl.Vol.), § 12–115(a) through (i) *with* §§ 12–624 and 12–625. The exception is that § 12–115(f) omitted the requirement of RISA § 12–625(a) that "the holder shall retain any repossessed goods in the county where the goods were sold to the buyer or were repossessed."

Prior to the 1983 session of the General Assembly, four Maryland banks transferred certain of their operations to Delaware where the banking laws were more favorable. These included the credit card operations of two major banks based in Baltimore. Some 1,000 jobs were lost in the Baltimore area. The response by the General Assembly was Chapter 143 of the Acts of 1983, the enactment of which was urged by then Mayor Schaefer of Baltimore and others. Chapter 143 has become known as the Credit Deregulation Act of 1983.

Chapter 143 approached problems in the banking industry three ways. One approach dealt with the acquisition of stock in banks located in Maryland by out-of-state bank holding companies. These provisions are now codified as Md.Code (1980, 1992 Repl.Vol.), Title 5, Subtitle 9 of the Financial Institutions Article (FI). The second approach was CLEC. It was not subject to the July 1, 1985, sunset of the increase to twenty-four percent for the maximum interest rate. § 12–1003. Among its provisions, CLEC addressed variable rate loans (§ 12–1004), excluded up to two points in loan fees from the usury ceiling on residential mortgages (§ 12–1005(a)), and excluded from the usury ceiling "[r]easonable fees for services rendered or for reimbursement of expenses incurred in good faith" (§ 12–1005(b)). The third approach of Chapter 143 was the enactment of CL Title 12, Subtitle 9, "Credit Grantor Revolving Credit Provisions"—provisions relating to open end credit (OPEC)—that are companion to CLEC. OPEC, for example, addresses revolving loan credit secured by residential mortgages.

As introduced CLEC and OPEC would have applied only to Maryland and federal banks. 1983 Md.Laws ch. 143, at

727–28, 742. Amendments in the course of passage substituted "credit grantor," including a retailer, for "bank" in the definitions of §§ 12–901 and 12–1001. OPEC and CLEC were also amended to include detailed regulation of repossessions. §§ 12–921 and 12–1021. Similar to the 1982 enactment of § 12–115, and unlike RISA, the OPEC and CLEC repossession regulations do not require that the property be held in the county of sale or of repossession, after repossession and while awaiting sale. Amendments to Chapter 143 also made credit grantors, except for sellers of goods or services not engaged in making cash advances, subject to the licensing, investigatory, enforcement and penalty-imposition powers of the Commissioner of Consumer Credit. §§ 12–915 and 12–1015.

OPEC and CLEC recognize that open end and closed end consumer credit disclosures are primarily governed by federal law under Regulation Z, 12 C.F.R. § 226.1 *et seq.*, and the two subtitles make few additional state law disclosure requirements.[4]

## IV

Following the enactment of CLEC, installment sellers of motor vehicles, such as Sherwood and Ourisman, "may, subject to the other provisions of [CLEC], offer and extend closed end credit to a borrower." § 12–1002(a). The General Assembly has not dictated which consumer installment sales are to be governed by CLEC and which by RISA. Rather, § 12–1014(a) provides: "Notwithstanding any other provisions of this title, a credit grantor may at its option elect to make a loan ... either pursuant to [CLEC] or as otherwise permitted by applicable law."

The election between RISA and CLEC as the legal framework for structuring a form contract to be offered to

---

**4.** An installment sale contract extending consumer credit under CLEC accordingly resembles a RISA contract because both are subject to the disclosure requirements of Regulation Z for closed end consumer credit.

potential debtors is made unilaterally by the credit grantor. This legal drafting election is the option of the credit grantor. If the credit grantor's offer of a CLEC-based contract is accepted, the efficacy of the election of CLEC is not dependent on the subjective intent or actual understanding of the debtor. OPEC § 12–914(a) is similar ("[A] credit grantor may at its option offer a plan to any borrower either pursuant to [OPEC] or as otherwise permitted by applicable law.").

If a creditor's election is effective under § 12–1014(a), CLEC expressly states the effect on other Maryland laws, but only with respect to those dealing with interest and with disclosures. Section 12–1013(a) provides:

"The provisions of any other law of this State limiting the rate or amount of interest, discount, points, finance charges, service charges, fines, fees, commissions, costs, expenses, or other charges which may be charged, taken, collected, received, or reserved shall not apply to extensions of credit made in accordance with [CLEC]." [5]

Section 12–1014(c) reads:

"Notwithstanding any provisions of [CL Title 12, 'Credit Regulations,'] a loan under [CLEC] is subject only to the disclosure requirements of [CLEC], and, to the extent applicable, of the federal Truth In Lending Act and regulations promulgated thereunder."

■ The most obvious way in which the creditor may elect CLEC's application to an extension of credit is to include in the contract documents a statement that CLEC applies. Ford Credit says that its form contract does precisely that in ¶ G ("The law of Maryland applies to this contract including Subtitle 10 of the Maryland Commercial Law Article."). The consumers argue that the Ford Credit

---

**5.** By Chapter 150 of the Acts of 1985 the sunset date of July 1, 1985, that had been part of the 1982 increase to a maximum rate of twenty-four percent, was deleted from a number of credit regulation statutes, including RISA. Consequently, there is no difference in the stated maximum rate of finance charge under RISA and under CLEC.

form fails to mention any title, and that, as written, ¶ G might have been referring to any one of the three subtitles 10 in the Commercial Law Article.

Although it surely would have been more precise legal drafting to include the appropriate title, in addition to the subtitle, for the reference to CLEC, that oversight was not fatal to the creditors' elections. One of the three subtitles 10 is in CL Title 11 and is entitled "Hulls of Vessels." That subtitle is simply irrelevant to Ford Credit's contract. Subtitle 10 of Title 14 is designated "Automotive Repair Facilities," and it generally sets out a consumer-protection scheme for car repairs. Although the scheme is not completely unrelated to the subject contracts, inasmuch as both contracts included extended service warranties, there is no reason why Ford Credit would have included reference to the auto repairs subtitle in its form installment contract. Moreover, when compared with Subtitle 10 of Title 12— CLEC—it is quite plain that Subtitle 10 of Title 12 is intended. Thus, there is an effective express election of CLEC in the contracts before us.

Legal Aid contends that ¶ G cannot be a sufficient election of CLEC because it merely includes CLEC among other Maryland laws. This is insufficient, argues Legal Aid, because an election between RISA and CLEC must be mutually exclusive, so that the creditor may not shift between one or the other statute during the course of the transaction in order to take advantage of more favorable provisions. For example, Legal Aid points to the more severe civil damages and criminal penalty provisions of CLEC, §§ 12–1017, 12–1018, as compared to RISA, §§ 12–630, 12–636. Legal Aid submits that the General Assembly could not have intended an equivocal statement of election, followed by purported operations under CLEC, and then an explicit election of RISA for penalties, if CLEC is violated.[6]

---

6. The argument is inspired by a footnote in an opinion of the Attorney General of Maryland, 68 Op.Att'y Gen. 206, 208 n. 2 (1983). The opinion discusses amendment of retail credit accounts that are gov-

Ford Credit does not disagree that the election must be made at the inception of the transaction and for the entire transaction. Ford Credit, however, submits that, in addition to an express reference to CLEC as part of the governing law, the election of CLEC may be effected by structuring the transaction to comply with CLEC. Thus, the contract as a whole will inform a court, administrator, or counsel for a borrower under which statutory scheme the credit grantor is proceeding, without the necessity of expressly stating that CLEC is elected, or that Maryland law governs the transaction, including CLEC.

With respect to an election between RISA and CLEC, Ford Credit is correct. The differences between the two statutes prevent a credit grantor, who fully complies with one or the other statute, from entering into a contract that is ambiguous or equivocal with respect to whether RISA or CLEC is elected. The differences prevent postponing an objective election until some later time than contract formation. RISA § 12–605(a) requires delivery of a copy of the RISA contract to the buyer at or before the time of signing. RISA § 12–606(c)(2) requires that the contract contain a notice to the buyer in twelve point bold type or larger, directly above the space for the buyer's signature, which tells the buyer that "[u]nder the State law regulating installment sales," the buyer has the right, *inter alia*, "[t]o require, under certain conditions, a resale of the property, if repossessed." This is a reference to the buyer's right under RISA to require repossessed goods to be sold at

---

erned by CL, Title 12, Subtitle 5 (RCAL) to accounts that are governed by OPEC. The Attorney General said:

"In exchange for more liberal provisions permitting fees and charges impermissible under RCAL, the General Assembly has imposed harsher penalties for violations. *Compare* CL §§ 12–513 and 12–515 *with* CL §§ 12–917 and 12–918. If CL § 12–914(a) were not interpreted to require an express, mutually exclusive election, a lender could conceivably insist that it retain the option of selecting the lesser penalty provisions of RCAL in the event of a violation of Subtitle 9. The General Assembly could not have intended so anomalous a result."

public auction, if the buyer has paid at least fifty percent of the cash price of the goods and timely has requested that resale in writing. § 12–626(a). CLEC's resale provisions are inconsistent with RISA. Under CLEC the credit grantor decides whether repossessed property will be sold at public auction or at private sale, and the buyer, no matter what percentage of the cash price of the goods has been paid, cannot dictate the nature of the sale. § 12–1021(j)(1).

■■■ Thus, the seller in a secured, closed end, consumer transaction elects RISA by utilizing a contract of sale that fully complies with RISA. A credit grantor in the same type of transaction, who fully complies with CLEC, including making the federally mandated consumer credit disclosures, but who would be in violation of RISA by failure to include the additional RISA disclosures, has rejected RISA and elected CLEC. Thus, as between RISA and CLEC, the concern expressed by Legal Aid over equivocal elections cannot arise. The inconsistency between the disclosure provisions required at the formation of the contract prevents the equivocation. Where, as here, the contract omits the notice to buyer required by RISA, but the contract does comply with CLEC in all respects, the credit grantor necessarily has elected CLEC. We reject the contention, implicit in consumers' position, that the sellers in these cases, by utilizing the Ford Credit form, should be viewed to have elected the law that puts their contracts in violation of that law, as opposed to having elected the law with which their contracts comply.[7]

■■■ Accordingly, the contract form used by the credit grantors in these cases elected CLEC in two ways—by express election and also by structuring the document consistently with CLEC and inconsistently with RISA. The RISA § 12–606(c)(2) mandatory notice to buyer, which is omitted in the Ford Credit contract form, is a disclosure

---

7. If a contract complies with neither RISA nor CLEC, it might be in violation of as many as three laws (two Maryland and one federal) depending on the violation; but that problem is not presented.

provision. The credit grantors, by having elected CLEC, did not violate § 12–606(c)(2) because CLEC, per § 12–1014(c), makes CLEC disclosures the "only" state law disclosures applicable to a CLEC transaction. Even though the transactions fall within the definition of RISA contracts, RISA mandates concerning disclosures for RISA contracts are expressly superseded by CLEC, as a result of the election of CLEC.

## V

■ The second violation of the petitioners' rights is alleged to have occurred when Ford Credit, after having taken an assignment of the contracts, repossessed without storing the vehicles in Baltimore City and Prince George's County, respectively, pending sale. As we have shown, the contracts of which Ford Credit became an assignee were contracts to which the election of CLEC applies. Any rights of the seller-car dealers under that election became rights of Ford Credit. *See Bachmann v. Glazer & Glazer, Inc.,* 316 Md. 405, 416, 559 A.2d 365, 370 (1989); *Huettner v. Savings Bank of Baltimore,* 242 Md. 477, 482, 219 A.2d 559, 562 (1966). Obligations assumed by Ford Credit were obligations imposed by the contract, by CLEC, or by other applicable law.

The place of storage of repossessed goods does not concern the rate of finance charge or the disclosure of terms. The provisions of §§ 12–1013(a) and 12–1014(c), under which CLEC, when elected, expressly controls over other laws, do not furnish a direct answer to the consumers' contention that the place of storage requirement of RISA applies to the subject repossessions. CLEC § 12–1021, while regulating repossession from a consumer borrower in a degree of detail comparable to that of RISA, is silent on the place of storage aspect of repossession. That degree of regulation in CLEC, however, evidences the intent of the General Assembly that § 12–1021 constitutes a complete system of regulation of repossessions in CLEC consumer transactions. Section 12–1021's complete scheme also evidences the legis-

lative intent that, once CLEC has been elected for a secured, closed end, consumer credit sale, none of the repossession provisions of RISA apply. If CLEC has been elected, only CLEC's repossession rules apply.

■ Section 12–1021, as initially enacted by Chapter 143 of the Acts of 1983, addressed each step of a repossession that was addressed in RISA §§ 12–624 through 12–627. These steps were the authorization to repossess, the limited means of repossession, a discretionary notice of intent to repossess, service of that notice, a post-repossession notice of redemption rights, a minimum period of retention by the creditor of repossessed security during which the debtor could redeem, the requirements for redemption, exceptions to the right of redemption, notice of sale, method of sale, disposition of sale proceeds, accounting for proceeds, and restrictions on a deficiency judgment.

As of the effective date of CLEC, there were some differences in these provisions between CLEC and RISA. As noted above, § 12–625(a) required the repossessing RISA seller to retain the goods in the county of sale or of repossession, but § 12–1021(f) omitted that requirement. While § 12–625(d) and § 12–1021(i) both contained fraud exceptions to the right to redeem, CLEC further restricted the right to redeem if there had been a prior repossession. Moreover, under RISA the buyer's right to have repossessed goods sold at public sale applied only if the buyer (1) had paid fifty percent of the cash price, (2) timely had requested a public sale, and (3) had paid a required deposit. § 12–626(a) and (b). On the other hand, CLEC, when enacted, flatly required a public sale in all repossessions governed by it. Former CLEC § 12–1021(j). Where the sale resulted in a deficiency the RISA creditor was not entitled to judgment therefor unless the entire RISA subtitle had been complied with, § 12–626(e)(4)(ii), while the CLEC creditor was not entitled to a deficiency judgment unless § 12–1021 had been complied with, § 12–1021(k)(4).

If the General Assembly had intended for the repossession provisions of RISA to apply to all closed end extensions of secured, consumer sales credit, even if CLEC had been elected, the General Assembly could have carved those consumer transactions from the similar, but not identical, repossession provisions of CLEC. Indeed, to eliminate all doubt, had it been the legislative intent, the General Assembly could have expressly provided that the repossession provisions of RISA continue to apply to transactions falling within the definition of a RISA transaction, even if CLEC had been elected. The General Assembly, however, did neither.

As introduced in the 1983 session of the General Assembly what became Chapter 143 applied only to banks. Retailers were added by amendment in the Senate on March 16, 1983. 1983 Senate Journal 1208, 1213. Then, with retailers included as credit grantors, the bill moved to the House of Delegates where the Attorney General's Office and the Administration sought consumer protection amendments to the bill. *See* Wooton, *Bank bill unsettles Hughes,* Evening Sun, Mar. 18, 1983, at A1; Letter from Deputy Attorney General, Eleanor M. Carey, to The Honorable Frederick C. Rummage, Chairman, House Economic Matters Committee (March 28, 1983). Provisions were added in the House establishing a scheme of repossession for CLEC transactions, patterned on the repossession provisions which had been included in § 12–115 when it was enacted by Chapter 753 of the Acts of 1982. *See* Message from the House of Delegates, 1983 Senate Journal 2465, 2475–77. Inasmuch as CLEC would apply to retailer-credit grantors, it would have been much simpler from a statutory drafting standpoint for the House to have incorporated RISA repossession provisions, *in toto,* for closed end consumer sales credit extended under CLEC. Instead, the General Assembly repeated the substance of almost all, but not quite all, of the RISA repossession provisions in stating repossession provisions for CLEC. The General Assembly's actions strongly indicate that the CLEC provisions for repossession

were intended to apply to all CLEC transactions, whether retail sale or loan. Consequently, the credit grantor, in conducting a repossession, was not required to mix and match with other possibly applicable statutes when CLEC already provided a fully developed repossession scheme for CLEC transactions.

In its sessions after that of 1983 the General Assembly, from time to time, has addressed the subject of repossessions in one or more of RISA, OPEC, CLEC, and § 12–115. We do not discern any pattern in these later enactments. Collectively they may be harmonized as a recognition by the General Assembly that different repossession regulations may be appropriate to repossessions arising out of transactions under different credit regulation statutes.

In 1984 the General Assembly, by Chapter 549, amended RISA to deal with the seizure under forfeiture laws by a police department of the security under a RISA contract. § 12–624(a)(2), former § 12–625(d)(2) (now § 625(d)), and § 12–626(e)(3). Corresponding amendments have never been made in the repossession provisions of CLEC or in § 12–115.

By Chapter 750 of the Acts of 1986 the General Assembly made substantively identical amendments to RISA and CLEC, but did not amend § 12–115 at all. Under these amendments to RISA and CLEC, the buyer may not redeem simply by paying the arrearage in the installment payments, without acceleration, and by paying other permitted charges, when the repossession occurred within eighteen months after an earlier repossession. Under the latter circumstance, in order to redeem, the buyer must pay the entire accelerated balance outstanding under the agreement. § 12–625(e) and 12–1021(i).

The amendment to the repossession provisions of CLEC which permits, at the creditor's option, a private sale of repossessed goods was enacted by Chapter 765 of the Acts of 1987. CLEC § 12–1021(j)(1). CLEC § 12–1021(j) was further amended to make private sales subject to a notice to

borrower requirement and that sales be accomplished in a commercially reasonable manner. CLEC § 12–1021(j)(1)–(2). Essentially identical amendments also were made by Chapter 765 to OPEC and to § 12–115.

Section 12–1021(j)(2) requires the selling creditor to account to the borrower and to file a copy of that accounting with the Commissioner of Consumer Credit, together with information concerning the sale itself. As enacted by Chapter 765 of the Acts of 1987, § 12–1021(j)(2)(vii) also required the creditor to identify the purchaser to the defaulting debtor. Under § 12–1021(j)(4) (former (j)(3)), if the Commissioner determines that the sale was not conducted in a commercially reasonable manner, the Commissioner is authorized to disallow any claim for deficiency. The same requirements were imposed under § 12–115(j)(2) and (3) (now (4)) and under § 12–921(j)(2) and (3).

In 1988 the General Assembly confirmed the foregoing, 1987 legislation. As introduced, the bill which became Chapter 765 of the Acts of 1987 would have applied only to OPEC. The bill's scope was expanded by amendments in the course of passage to include CLEC and § 12–115 but the title of the bill was not amended to reflect that expansion. Chapter 5 of the Acts of 1988, a corrective statute, confirmed that the bill added §§ 12–115(j) and 12–1021(j) as well.

By Chapter 632 of the Acts of 1988, §§ 12–115(j) and 12–1021(j) were amended to provide that the identity of the purchaser at a private sale be furnished only to the Commissioner of Consumer Credit and that the accounting to the buyer include a disclosure that the purchaser's identity might be provided by the Commissioner to the defaulting debtor. *See* § 12–115(j)(2)(vii) and (j)(3); § 12–1021(j)(2)(vii) and (j)(3). No changes were made to RISA. *See* § 12–626(e). OPEC § 9–921(j)(2)(vii) was not modified.

The foregoing review demonstrates that there were some differences in repossession regulations between RISA and CLEC when CLEC was adopted, and that other differences

between the two have been created by later enactments. The repossession systems of RISA and CLEC are respectively complete in themselves, in the sense that each is intended to be applied independently of the other. Accordingly, we do not read the limitation on the locale of storage of repossessed goods from RISA into CLEC. Thus, if CLEC has been elected, its provisions that completely regulate an aspect of the transaction, such as repossession, will not be supplemented by arguably consistent provisions drawn from RISA.

## VI

There remains, however, the question, implicitly raised by other arguments of the consumers, whether CLEC is intended to apply exclusively to all aspects of a transaction for which CLEC has been elected, even if CLEC is silent on, but RISA speaks to, the aspect of the transaction under consideration.

■ Implicit in Legal Aid's argument that an effective election of CLEC is "mutually exclusive" of RISA is the concept that CLEC then becomes the only body of Maryland law that bears on any aspect of the transaction. That is correct as to any aspect, such as interest, disclosure, or repossession, as to which the Legislature manifested an intent that CLEC have that effect. But there are subjects regulated by RISA, by other Maryland statutes, and by common law, that are not addressed at all by CLEC. In other words, an election to extend credit under CLEC does not make RISA, or other Maryland law, entirely irrelevant to the credit transaction. By the often-expressed rule of statutory construction, two statutes that relate to the same subject matter will be harmonized to the fullest possible extent. *See, e.g., State v. Bricker,* 321 Md. 86, 93, 581 A.2d 9, 12 (1990); *Kaczorowski v. Mayor & City Council of Baltimore,* 309 Md. 505, 511, 525 A.2d 628, 631 (1987);

*Management Personnel Servs. v. Sandefur*, 300 Md. 332, 341, 478 A.2d 310, 314 (1984).

■ For example, RISA § 12–603 prohibits discrimination in RISA extensions of credit on the basis of sex, marital status, geography, and age of buyer.[8] CLEC does not address in any way the subject of discrimination in credit extension decisions. CLEC does not expressly supersede RISA on that subject. CLEC is not inconsistent with RISA on that subject. Nothing prevents applying CLEC and RISA harmoniously to any discrimination contentions. A rule of complete, mutual exclusivity between RISA and CLEC would be inconsistent with ordinary statutory construction. *See* 75 Op. Att'y Gen. ____ (No. 90–038, Aug. 7, 1990) (requirement of § 12–109 that lenders pay interest on escrow accounts also applies to residential mortgage loans made under CLEC).

The foregoing analysis is an additional reason for rejecting the consumers' argument that ¶ G of the Ford Credit contract fails as an express election because it says that "[t]he law of Maryland applies." The law of Maryland, including provisions of RISA that are consistent with CLEC, *does* apply even if the installment seller elects CLEC.

The foregoing analysis also brings into focus our reasons for rejecting certain ancillary arguments advanced by the consumers. The consumers say that the Ford Credit contract refers to the original parties as buyer and seller whereas CLEC refers to the parties as consumer borrower and credit grantor. The latter terminology is not mandated by CLEC. Indeed, the definition of a credit grantor in § 12–1001(b)(1) includes a retailer. There is no inconsistency with CLEC.

---

8. For purposes of this example, we ignore overlapping requirements of the federal Equal Credit Opportunity Act, Title 15, U.S.Code § 1691 *et seq.* and the comparable Maryland statute, §§ 12–701 through 12–708.

The consumers say that RISA was elected because the Ford Credit contract contains an acknowledgment of receipt by the buyer of a copy of the contract at the time of signing, a subject addressed by RISA.[9]  CLEC does not undertake to regulate the subject of acknowledgments of receipt of a copy of the contract.  There is no inconsistency with CLEC.

Finally, the consumers point to sections of RISA that prohibit leaving blank spaces to be filled in after the RISA contract is signed, prohibit provisions for confession of judgment, and prohibit provisions for acceleration of time balances if the holders deem themselves insecure.  § 12–607(a)(1), (2), and (4).  Because the Ford Credit contract does not contain these features prohibited by RISA, the consumers say that RISA has been elected.  But CLEC does not undertake to regulate any of these aspects of an installment sale under CLEC.  There is no inconsistency with CLEC.  The significance of this lack of inconsistency, however, is twofold.  First, the absence of the RISA prohibited provisions from the contract in no way indicates that CLEC has been rejected, because CLEC does not require inclusion of the provisions.  Second, because those prohibitions in RISA are not expressly superseded by CLEC, and because the prohibited subjects are not even regulated by CLEC, the prohibitions can be harmonized with CLEC.  Those RISA prohibitions operate to prohibit the inclusion of such provisions in an installment sale contract for which the creditor has elected CLEC.

---

**9.** CL § 12–605(d) reads:
  "An acknowledgment of delivery of a copy of an installment sale agreement shall be printed in 12–point type or larger, and, if the acknowledgment is contained in the agreement, it shall be printed immediately below the signature to the agreement and independently signed."
In the Ford Credit form the acknowledgment is not printed below the signature and is not independently signed.  Petitioners make no issue of this.  Even if § 12–605(d) is a mandatory disclosure obligation in contracts governed by RISA, where, as here, OPEC has been elected, the disclosure requirements of RISA are expressly superseded.  § 12–1014(c).

## VII

Ford Credit has conceded that the circuit court in *Biggus* incorrectly awarded prejudgment interest from December 12, 1989, and that prejudgment interest should run at six percent from February 23, 1990, the date on which Ford Credit notified Biggus of the deficiency. The judgment in *Biggus* should be modified accordingly.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IN NO. 123, SEPTEMBER TERM, 1991, AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR A MODIFICATION OF THE JUDGMENT CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EVENLY BETWEEN THE PARTIES.

JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY IN NO. 4, SEPTEMBER TERM, 1992, AFFIRMED. COSTS TO BE PAID BY THE PETITIONERS.

CHASANOW, Judge, dissenting, in which ELDRIDGE and ROBERT M. BELL, JJ. join.

In order to reach its result, the majority takes two steps. First, it concludes that Ford Motor Credit Company (Ford) validly elected to bring its retail installment sale contracts with Mr. Biggus and the Jacksons under Title 12, Subtitle 10 of the Commercial Law Article, "Credit Grantor Closed End Credit Provisions" (CLEC). Second, it concludes that the only repossession provisions applicable in the instant cases are those of CLEC, and not of Commercial Law Article Title 12, Subtitle 6,[1] the "Retail Installment Sales" Act (RISA).

Addressing the majority's conclusions in inverse order, first I believe that the RISA repossession provisions rather than the CLEC repossession provisions govern the reposses-

---

1. All references to section numbers herein are to Maryland Code (1975, 1990 Repl.Vol., 1992 Cum.Supp.), Commercial Law Article.

sion since the only effect of a CLEC election in a RISA transaction is that CLEC disclosure, interest, and finance charge provisions supersede RISA disclosure, interest, and finance charge provisions. Second, if my initial contention is incorrect and if RISA is superseded by CLEC in areas other than disclosure, interest, and finance charges, then the effect of a CLEC election is loss of important RISA consumer protections, and I would hold that the CLEC election in the instant case was invalid because it was not clear and unambiguous.

## I.

The legislature enacted RISA in 1941 to protect installment buyers from oppressive business practices that accompanied the growing availability of consumer credit. *Associated Acceptance Corp. v. Bailey*, 226 Md. 550, 555, 174 A.2d 440, 443 (1961). It protects the buyer by mandating the inclusion of certain provisions in installment sale contracts that fall within its scope, and forbidding the inclusion of others. *Stride v. Martin*, 184 Md. 446, 451, 41 A.2d 489, 491–92 (1945) (citing Legislative Council Research Report No. 6) (legislation "aims to eliminate 'contract abuses' by requiring the contract to ... contain certain information and not to contain certain provisions"). The contracts at hand are undoubtedly within the scope of RISA, a scope which is fairly broad. Under RISA, an installment sales agreement is any

"contract for the retail sale of consumer goods, negotiated or entered into in this State, under which: (i) Part or all of the price is payable in one or more payments after the making of the contract; and (ii) The seller takes collateral security or keeps a security interest in the goods sold." [2]

§ 12–601(*l*)(i). Motor vehicles are explicitly covered. § 12–609. Thus, we start from the assumption that the transac-

---

2.  A limit on RISA's coverage is that, in its present form, it applies only where the cash price of the goods is $25,000 or less. § 12–601(j).

tions in question are by definition RISA transactions, a point which Ford concedes. Ford acknowledges that the contracts meet the definition of "retail installment sale agreements" in RISA and that RISA would govern unless CLEC was validly elected pursuant to § 12–1014(a). RISA is the primary statutory scheme for retail installment sales—the transactions in question are automatically transactions to which RISA will apply unless superseded by other applicable law. Although I agree that CLEC can be made applicable to a RISA transaction upon proper election, I would maintain that RISA's repossession provisions should remain applicable to any transaction falling within the scope of RISA, regardless of whether or not CLEC has been elected.

The majority says that where CLEC has dealt with a particular "aspect" of the transaction, CLEC's provisions will supersede RISA's for that "aspect." Where two statutes deal with similar "aspects," I believe we should attempt to determine legislative intent and/or utilize recognized rules of statutory construction to harmonize the two. We should not simplistically say that because two statutes cover similar "aspects" one preempts the other. An analysis of RISA and CLEC leads, I believe, to the conclusion that in the instant cases the RISA repossession provision controls over the CLEC repossession provision.

When interpreting a statute's provisions, our goal is to ascertain and effectuate the intention of the legislature. *Mustafa v. State*, 323 Md. 65, 73, 591 A.2d 481, 485 (1991). Our focus is, therefore, centered upon the statute's purpose or policy. *Id.; Kaczorowski v. City of Baltimore*, 309 Md. 505, 513, 525 A.2d 628, 632 (1987); *see also Harford County v. University of Md. Medical Sys. Corp.*, 318 Md. 525, 529, 569 A.2d 649, 651 (1990). In enacting CLEC, the legislature's primary purpose was to allow banks to charge higher interest rates and increase certain charges to borrowers. I do not believe that in adopting CLEC, the legislature meant by implication to repeal important consumer protection provisions which it had previously enacted. In

fact, we have repeatedly held that the law does not favor repeal by implication. *Management Personnel Servs. v. Sandefur*, 300 Md. 332, 341, 478 A.2d 310, 314 (1984); *Board of Educ. of Garrett County v. Lendo*, 295 Md. 55, 62–63, 453 A.2d 1185, 1189 (1982); *Police Comm'r v. Dowling*, 281 Md. 412, 418–19, 379 A.2d 1007, 1011 (1977); *Commission on Medical Discipline v. Bendler*, 280 Md. 326, 330, 373 A.2d 1232, 1234 (1977).

When the legislature enacted CLEC, it clearly recognized that many of the credit contracts where CLEC could now be elected by the lender would, in the absence of a CLEC election, be regulated by one or more other statutes. The retail installment agreements in the instant cases are such contracts, as the underlying transactions are RISA transactions. The legislature obviously also recognized that, where CLEC was elected by the lender, there could be conflicts with other statutes, like RISA, which would regulate the contract absent the CLEC election. In sections 12–1013(a) and 12–1014(c) of CLEC, the legislature gave us specific guidance as to how to resolve these conflicts. Those sections tell us definitively that in two specific areas—the area of interest and finance charges, as well as the area of disclosure—CLEC supersedes other statutory provisions which would have also regulated the loan absent the CLEC election. By specifically enumerating the two areas where CLEC supersedes other statutes which would otherwise have regulated the loan, I believe the legislature was clearly telling us that other statutory provisions which also regulate the particular type of CLEC loan (like the RISA statute) are not superseded by CLEC. This is in keeping with the familiar maxim of statutory construction that "expressio unius est exclusio alterius"—the expression of one thing is the exclusion of another. Maryland has long recognized this basic rule. *See Gay Investment Co. v. Comi*, 230 Md. 433, 438, 187 A.2d 463, 466 (1963); *Johns v. Hodges*, 62 Md. 525, 538 (1884).

Limiting CLEC's applicability as described would also help explain the rather unusual unilateral right of the credit

grantor "at its option" to elect to make the loan pursuant to CLEC. § 12–1014(a). If the effect of a CLEC election is to deprive the borrower of important statutory protections such as those given other RISA buyers, as the majority believes, then the election to eliminate these protections should require the mutual intent and a decision by both parties to the contract. On the other hand, if the only effect of a CLEC election is to permit the lender to impose CLEC interest and other charges as per § 12–1013(a) and to provide for uniform disclosure requirements so there can be a single CLEC contract form applicable to all CLEC contracts as per § 12–1014(c), then it seems more reasonable to make the CLEC election at the "option" of the lender since those disclosure, interest, and finance charge provisions are clearly spelled out in any contract prepared by the lender.

The majority contends that by endowing CLEC with a full-blown repossession scheme, which addresses "aspects" contained in the RISA scheme, the legislature implied that the CLEC provisions would supersede the RISA provisions. Under this view, application of the CLEC repossession scheme would follow from a valid CLEC election, while failure to elect CLEC would leave RISA's repossession scheme applicable. A more convincing explanation for CLEC's full-blown repossession scheme, I believe, is that there are many CLEC loans secured by personal property which are non-RISA loans. These include loans which are not pursuant to installment sales, as well as installment sale transactions where the cash price of the goods is over $25,000. _See_ § 12–601(j). The legislature needed to provide a repossession scheme for these non-RISA transactions, and CLEC § 12–1021 is the result.[3]

---

**3.** The majority opinion reviews some of the legislative history of the CLEC repossession provisions, which unfortunately is not very enlightening. The opinion goes on to conclude "[t]he General Assembly's actions strongly indicate that the CLEC provisions for repossession were intended to apply to all CLEC transactions, whether retail sale or loan." 328 Md. 188, 205–06, 613 A.2d 986, 995 (1992). I do not believe the General Assembly's actions strongly indicate this

The majority's implied preemption approach will result in considerable uncertainty as well as the possible loss of other consumer protections which buyers should not be made to forfeit by implication alone. In the case of any transactional elements which are in some manner addressed by both RISA and CLEC, a court would, under the majority approach, have to analyze whether in this area CLEC implicitly preempts RISA. Applying the majority's test, the court would first have to determine whether the relevant CLEC provision addressed "aspects" of the relevant RISA provision and then conclude whether or not CLEC supplants RISA completely, partially, or not at all.

---

conclusion. In fact, if we carefully examine the best indication of legislative intent—the words of the statute—we discover that the CLEC provisions for repossession may not even authorize repossession for CLEC loans. In authorizing repossessions, CLEC § 12–1021(a)(1) provides that "[a] credit grantor may repossess tangible personal property securing *a plan* under an agreement if the consumer borrower is in default." (Emphasis added). Thus the CLEC repossession provisions are only applicable to repossession of personal property which is security for "a plan" under an agreement. The CLEC statute does not define "plan," however. "Plan" is defined in the immediately preceding subtitle of Title 12, the Credit Grantor Revolving Credit Provisions. Md.Code (1975, 1990 Repl.Vol., 1992 Cum.Supp.), Commercial Law Art., §§ 12–901 to 12–921. Section 12–901(e) defines a "plan," and states in relevant part:

> *"Revolving Credit Plan"* or *"plan"* means a plan that contemplates the extension of credit under an account governed by an agreement between a credit grantor and a borrower [to make purchases and obtain loans from time to time which are charged to the borrower's account]. (Emphasis added).

The CLEC statute's reference to "a plan" in the definitions section is very specific—a "plan" is explicitly *not* a CLEC transaction. Section 12–1001(e) states:

> "'Closed end credit' [CLEC] means the extension of credit by a credit grantor to a borrower under an arrangement or agreement which is *not* a revolving credit plan as defined in Subtitle 9 of this title." (Emphasis added).

We are left with the anomaly that "a plan" is clearly *not* a CLEC transaction, yet the CLEC repossession provision *only* authorizes repossession of personal property which is "securing *a plan.*" Regardless of whether the CLEC repossession provisions cover other CLEC transactions, unquestionably the automobiles in the instant cases were not security for "a plan"; they were security for a RISA sale.

For example, consider the potential result when the majority's analysis is applied to the provisions controlling what creditor's attorney's fees may be charged to the buyer. Section 12–623(b)(i) of RISA provides that attorney's fees may not exceed fifteen percent of the amount due and payable under the agreement. Section 12–1011(a) of CLEC permits collection of "a reasonable attorney's fee." If the creditor elects CLEC, does the CLEC provision supersede the RISA provision?[4] By the majority's analysis, we must ask whether CLEC § 12–1011(a) covers the "aspects" of RISA § 12–623(b)(i). Assuming that it does, the majority test would then leave the consumer borrower without the protection of the fifteen percent RISA ceiling and subject it to a case-by-case interpretation of "reasonable attorney's fee."

A second illustration of the effect of the majority's approach can be found in its application to insurance requirements under RISA and CLEC. Section 12–609(d)(2) of RISA places limits on the amount and types of insurance that the holder can require the buyer of a motor vehicle to carry. CLEC's insurance provisions, §§ 12–1007–1007.1 impose no such limits. Here again, does CLEC address the "aspects" of RISA's insurance requirements and replace them *in toto?* If so, this would allow the credit grantor's unilateral election of CLEC to permit it to require whatever insurance it deems proper, even beyond the RISA-imposed limits. Considering that CLEC's insurance provisions are extremely broad, applying to all CLEC transactions including real estate purchases, and the RISA insurance section is extremely narrow, covering motor vehicles exclusively, it is difficult to believe that the legislature intended by its enactment of CLEC to repeal RISA's express protection of the RISA vehicle buyer with respect to insurance.

---

4. Query if a contract calls for 20% attorney's fees or even reasonable attorney's fees, is that indicative of a CLEC election under the majority's approach?

I believe basic principles of statutory construction also support my view that the legislature, by enacting CLEC and permitting it to include RISA transactions, did not intend to revoke by implication specific consumer protections provided by the pre-existing RISA statute. The majority recognizes that RISA has a repossession provision granting RISA buyers specific protections, including the § 12–625(a) requirement that repossessed property be stored for fifteen days in the county where sold or repossessed. However, confronted with CLEC's repossession provision, which contains no requirement as to where repossessed goods must be stored awaiting sale, the majority holds that the CLEC repossession statute controls and *sub silentio* deprives the RISA buyer of this and perhaps other RISA-granted protections.

I would here invoke a familiar principle of statutory construction: that when two statutes deal with the same subject matter, and are not necessarily inconsistent with each other, they should be harmonized and full effect given to each. *Bridges v. Nicely,* 304 Md. 1, 10, 497 A.2d 142, 146 (1985); *Management Personnel Servs.,* 300 Md. at 341, 478 A.2d at 314. This is true notwithstanding the fact that the statutes may have been enacted at different times with no reference to each other, because in that case the rule is that statutes must be harmonized to the extent possible. *Id.; Lendo,* 295 Md. at 62, 453 A.2d at 1189.

In the case before us, I would apply this rule to harmonize CLEC and RISA with respect to the repossession provision in question. I would hold that a RISA creditor who properly elects CLEC should get the benefit of those provisions of CLEC that the legislature expressly provided would supersede other statutes. Beyond these limited areas, RISA buyers should still receive those RISA protections which the legislature intended RISA buyers to have. A CLEC election should supersede RISA protections only in the areas specifically set out by the legislature. To hold otherwise would repeal a RISA buyer's statutory protections by vague implication because their contracts are addi-

tionally regulated by another statute. As I noted earlier, such repeal by implication is not favored.

In short, the majority's analysis divides the "aspects" of a RISA/CLEC contract (a RISA contract where the lender elects CLEC) into three categories. The first category is where CLEC explicitly provides that it supersedes other laws including RISA. This is so only in the two expressly delineated areas noted above: the areas of interest and other charges under § 12–1013(a), as well as the area of disclosure under § 12–1014(c). I agree with the majority that the legislature expressly made CLEC supersede RISA provisions in these aspects of the contract.

The second category of "aspects" of a RISA/CLEC contract is where CLEC is completely silent. Here, the majority concedes that nonconflicting provisions from other statutes like RISA can be applicable. As an example, the majority notes that the nondiscrimination provision of RISA, § 12–603, which has no analogue in CLEC, is applicable regardless of a CLEC election, as long as the subject matter of the transaction came within RISA as well. I agree with the majority that CLEC silence does not supersede RISA provisions in these aspects of the contract.

The final category of "aspects" of a RISA/CLEC contract is where CLEC and RISA both deal with the same "aspect," though not identically, and CLEC does not expressly indicate that it supersedes RISA. This is the situation with the repossession requirements at issue in the instant case. I do not believe that the statutes indicate or that the legislature intended that CLEC's silence about where the automobiles must be stored should supersede RISA's express provision as to where the automobiles must be stored.

For the above reasons, I believe that the comprehensive CLEC provisions regulate CLEC loans which are not also regulated by other statutes. But, where the legislature has provided that other statutes like RISA regulate the specific transaction in question, then these statutes continue to regulate the transaction even after the lender's unilateral

CLEC election except in the specified areas where the legislature has spelled out that CLEC supersedes other statutory provisions, *i.e.*, disclosure, interest, and finance charge requirements.

## II.

What is required for a valid CLEC election depends on the effect of that election. If, as I have indicated in Part I, the only effect of a CLEC election is to supersede RISA's disclosure, interest, and finance charge provisions, then CLEC could be validly elected simply by including in the contract the CLEC disclosure, interest, and finance charge provisions. The majority holds, however, that a CLEC election does more—it deprives the RISA purchaser of significant RISA protections. If this is so, the CLEC election should be clearly made so as to notify the RISA purchaser that important protections granted other RISA buyers by the RISA statute are not available to this RISA buyer because of the CLEC election.

With respect to Ford's election of governing law, all parties agree that installment sellers such as the auto dealers in these cases may "offer and extend closed end credit to a borrower" under CLEC. § 12–1002(a). This election is at the option of the credit grantor. § 12–1014(a). I do not believe that these options given to Ford by the Code allow Ford to draft a contract that is either accidentally or intentionally ambiguous, if not misleading, as to the CLEC election, if the effect of that election is to deprive a RISA buyer of other important RISA consumer protections.

According to the majority, CLEC, while providing some borrower protections, removes certain consumer protections guaranteed by RISA. For example, CLEC does not contain some of RISA's buyer protections with respect to repossession. RISA requires the repossessor to hold a public auction when the buyer has paid at least fifty percent of the cash price of the goods and requests a public sale within fifteen days of receiving notice from the repossessor.

§ 12–626(a). Under CLEC, the repossessor may, at its sole election and regardless of how much the buyer has paid, opt for a public or a private sale. § 12–1021(j). Also, RISA requires the repossessor to retain the goods for fifteen days in the county in which the goods were sold to the buyer or repossessed. § 12–625(a). This provision gives the buyer fifteen days in which to redeem, take possession of the goods, and resume performance without having to travel to some remote location to do so. § 12–625(b). CLEC has no such protection.

If we accept the majority's premise that a CLEC election results in the loss of some RISA-guaranteed protections which could materially change the terms of the RISA contract to the buyer's legal detriment, then I believe that a creditor's election of CLEC which deprives the buyer of RISA protections must be done in a clear and unambiguous manner. If a credit grantor is able to deprive a retail installment buyer of statutory protections by electing to make the loan under CLEC, the buyer ought to be clearly informed of that election. Ford not only asserts that it alone elects whether the contract is a CLEC contract, but also contends that the only relevant issue is whether Ford made such an election, not how or even if Ford's election was communicated to the buyer. The majority seems to agree, saying that "the efficacy of the election of CLEC is not dependent on the subjective intent or actual understanding of the debtor." 328 Md. 188, 199, 613 A.2d 986, 992 (1992). I doubt that the legislature intended that a credit grantor may elect to deprive the borrower of protections guaranteed by RISA without clearly informing the borrower of this election.

The most obvious way for a creditor to properly elect to bring a contract under CLEC, as the majority recognizes, would be to include explicit language in the contract. 328 Md. at 199, 613 A.2d at 992. The majority holds that there is such an explicit election of CLEC in the cryptic language of paragraph G of the contract:

"**G. General:** Any change in this contract must be in writing and signed by you and the Creditor. *The law of Maryland applies to this contract including Subtitle 10 of the Maryland Commercial Law Article.* If the applicable law does not allow all of the agreements in this contract, the ones that are not allowed will be void. The rest of this contract will still be good." (Emphasis added).

As the majority points out, there are three subtitle 10's in the Commercial Law Article. Subtitle 10 of Article 11, entitled "Hulls of Vessels," can be readily dismissed as inapplicable. Subtitle 10 of Article 14, however, is entitled "Automotive Repair Facilities" and is at least peripherally related to the automobile sales contracts in the instant case. It mystifies me how the majority could conclude that no ambiguity is created by this poorly worded reference to Subtitle 10 and further conclude that this provision constitutes an "effective express election of CLEC." 328 Md. at 200, 613 A.2d at 992 (1992). The majority says that "there is no reason why Ford Credit would have included reference to the auto repairs subtitle in its form installment contract," 328 Md. at 200, 613 A.2d at 992, but the issue is not whether there was a reason for Ford to identify one section or another. Rather, the issue is whether there is an ambiguity in Paragraph G, and I believe there certainly is one. The majority's statement that "it surely would have been more precise legal drafting to include the appropriate title, in addition to the subtitle, for the reference to CLEC," *id.,* says far too little. If the mere reference to Subtitle 10 is intended as a CLEC election, that election is certainly ambiguous, if not actually misleading, especially when considered along with the balance of the contract. Even from its first line, the Ford contract confuses the matter and confounds the reader. The contract being construed is titled "Maryland Vehicle Retail Instalment Contract." If the contract is meant to be governed by CLEC and not by RISA, as Ford claims, the reference to a retail installment

contract is misleading.[5]  In addition, the parties to the contract are referred to as "buyer" and "seller," RISA terms, and not the CLEC terms "consumer borrower" and "credit grantor." *Compare* § 12–601 *with* § 12–1001 (setting out definitions for RISA and CLEC statutes).

As Ford acknowledges, it is a canon of contract construction that ambiguities in the contract are to be construed against the drafter because that party had the better opportunity to understand and explain its meaning. *King v. Bankerd,* 303 Md. 98, 106, 492 A.2d 608, 612 (1985); *see also Burroughs Corp. v. Chesapeake Petroleum & Supply Co.,* 282 Md. 406, 411, 384 A.2d 734, 737 (1978).  This rule would lead to construction of the ambiguities in the contract against Ford, and thus against an election of CLEC.  To counter the effect of this rule, Ford reminds us that contracts ought not to be construed so that the result is "absurd or unreasonable," which is how it characterizes any conclusion that it failed to elect CLEC properly.  In my view, however, refusal to give Ford the benefits of CLEC when it failed to make an unambiguous clear election is neither absurd nor unreasonable.  In fact, it seems just the opposite.  It gives the RISA buyer the benefits that I believe the legislature intended RISA buyers to have absent these rights being expressly, clearly, and lawfully abrogated by the contract.

The majority, however, goes even further and also holds that the lender can elect CLEC and thereby deprive the buyer of significant consumer protections provided by RISA without saying so in the contract, solely "by structuring the document consistently with CLEC and inconsistently with

---

**5.**  Ford attempts to downplay the significance of the contract's heading, but even in its own bill of complaint and motion for summary judgment it states "Respondent purchased a motor vehicle and financed a portion of the purchase price by executing a *Retail Installment Sales Contract*." (Emphasis added).  It was not until much later, when the buyers asserted the defense under the RISA repossession section, that Ford contended this was not a RISA contract but instead was a CLEC contract.

RISA." 328 Md. at 202, 613 A.2d at 994. This seems at odds with fundamental principles of contract law as well as fundamental notions of fairness. If, as the majority holds, the effect of a CLEC election is to supersede and decrease protections given the buyer by other statutes which would be applicable absent the CLEC election, it seems only reasonable to require that such an election with its accompanying loss of statutory protections be spelled out in a way the buyers can clearly understand. This election by inconsistent drafting also creates a great deal of unnecessary confusion since, according to the majority, in order to tell whether CLEC or RISA (or some other statute) controls, the contract must be compared to both CLEC and RISA to see which statutory scheme the contract most resembles. The instant contracts are rather ambiguous even under the majority's analysis. They contain the CLEC required disclosures but, in addition, add disclosures similar to those required in RISA.

Ford asserts that it was merely being generous to its borrowers when it made disclosures in the contract similar to those required by RISA but not required by CLEC. Ford compares the language of certain disclosures in its contract with the language required by RISA to demonstrate that it was gratuitously disclosing more than CLEC requires. Ford's generosity in this regard, however, should go unrewarded. Ford wants praise for drafting a contract which, even by its title, seems to be governed by RISA, which contains cryptic language arguably implicating CLEC, and which includes several RISA-type provisions for good measure. In my opinion, this makes the contract more confusing.

These additional disclosures become even more troublesome in light of the majority's holding that a borrower must compare the contract disclosure provisions with CLEC and RISA in order to determine whether CLEC has been elected. The majority says that

"the seller in a secured, closed end, consumer transaction elects RISA by utilizing a contract of sale that fully

complies with RISA. A credit grantor in the same type of transaction, who fully complies with CLEC, ... but who would be in violation of RISA by failure to include the additional RISA disclosures, has rejected RISA and elected CLEC."

328 Md. at 202, 613 A.2d at 993. Under this test, what result obtains where, as here, the creditor made disclosures to the buyer similar but not identical to those required by RISA § 12–606(c)(2), and which are not required by CLEC? By placing such heavy weight on the content of the disclosures, I fear the majority's analysis may only further confuse the matter. Extending this analysis, in order to tell if a creditor elected CLEC, one would have to compare each provision of the contract with CLEC and also with RISA to see whether it complies more with CLEC than RISA or more with RISA than CLEC.

The majority ultimately arrives at its holding that Ford elected CLEC because it did not fully comply with RISA. It accepts Ford's argument that by structuring the contract disclosure provisions in a manner consistent with CLEC, Ford implicitly elected CLEC. I would not permit this election by implication if the result of the election is to deprive the buyer of protections otherwise guaranteed by the legislature to RISA buyers such as Mr. Biggus and the Jacksons.

If the effect of a CLEC election is as substantial a loss of RISA consumer rights as the majority opinion indicates, then the CLEC election should be clearly spelled out in the contract. If, however, the only effect of a CLEC election is to allow the use of CLEC disclosure, interest, and finance charge provisions, then simply using CLEC disclosure, interest, and finance charge provisions in the contract could constitute a CLEC election since the contract itself fully informs the RISA buyer of the relevant aspects of the CLEC election.

For the above-stated reasons, I respectfully dissent.

Judge ELDRIDGE and Judge ROBERT M. BELL have authorized me to state that they join in the views expressed in this dissent.